UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

United States of America    )
                            )
v.                          )            CRIMINAL NO. 05CR10214MLW
                            )
Florentino Ruidiaz, Jr.     )
_____)

## DEFENDANT FLORENTINO RUIDIAZ'S MOTION TO SUPPRESS WEAPON AND AMMUNITION

Defendant, Florentino Ruidiaz, respectfully requests that this Honorable Court suppress the weapon and ammunition that the government intends to produce as evidence because they were seized as a result of an unlawful search.  This request is made pursuant to the Fourth Amendment of the United States Constitution, which protects individuals from unreasonable search and seizure; Florida v. J.L., 529 U.S. 266 (2000); Terry v. Ohio, 392 U.S. 1 (1968); United States v. Galab, 325 F.3d 63 (1st Cir 2003); United States v. Stanley, 915 F.2d 54 (1st Cir. 1990); United States v. Espinoza, 433 F.Supp.2d 186 (D. Mass 2006); United States v. Romain, 393 F.3d 63 (1st Cir 2004); United States v. McKoy, 402 F.Supp.2d 311 (D. Mass 2004) aff'd 428 F.3d 38 (1st Cir 2005));  United States v. Hart 334 F.Supp.2d 5 (D. Mass 2003).

In support hereof, the defendant relies upon a separate memorandum of law, transcripts, and affidavit.

Respectfully Submitted,
Florentino Ruidiaz, Jr.
By his attorney,

/s/ Robert S. Sinsheimer
B.B.O No. 464940
Denner Pellegrino, LLP
4 Longfellow Place, 35th Floor
Boston, MA 02114
617-722-9954

Dated: September 29, 2006

**Certificate of Service**

I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2006.

/s/ Robert S. Sinsheimer

2

· **RUIDIAZ REVISED TRANSCRIPT**

| | |
|---|---|
| **911:** | Call's recorded, what is your emergency? |
| **Caller:** | Yeah, um, I was out there chillin'. |
| **911:** | There's what? |
| **Caller:** | I was, I was inside my the house. |
| **911:** | Yup. |
| **Caller:** | And then, then, some neighbor or I don't know where they're coming from, they're shooting in the air with a gun, um, [inaudible] |
| **911:** | They're shooting a gun? Where are you sir? |
| **Caller:** | Um, French Ave. |
| **911:** | French Ave? |
| **Caller:** | Yep. [inaudible] |
| **911:** | Can you see who's doing it?  Your phone is, you're phone is terrible, I can barely hear you.  You're on French Ave and somebody's shooting a gun off in the air? |
| **Caller:** | Yeah. |
| **911:** | Can you see them? |
| **Caller:** | Yeah, I think. |
| **911:** | You did? Okay. Were they in a car? |
| **Caller:** | They, they, they're out there right now.  In a Benz. |
| **911:** | They're outside in a what? |
| **Caller:** | Huh, they're out there. |
| **911:** | Sir? |

| | |
|---|---|
| **Caller:** | They drive a Benz. |
| **911:** | A van? |
| **Caller:** | No a Benz. Mercedes Benz. |
| **911:** | A Mercedes Benz? |
| **Caller:** | Yep. |
| **911:** | What color is it? |
| **Caller:** | Green. |
| **911:** | What color? Green? |
| **Caller:** | Yup. |
| **911:** | Okay, hold on a second. |
| **Caller:** | [inaudible] |

[ **Background conversation** ]

| | |
|---|---|
| **911:** | Can you see a plate? |
| **Caller:** | Hmm? |
| **911:** | Can you see a plate...on the car? Are you right near it? |
| **Caller:** | No, I can't see it clearly. |
| **911:** | Ok, so French Ave.  What number, French Ave? Or, or, what area? |
| **Caller:** | 126.  They're deep [inaudible].  That's where they live. |
| **911:** | 136 French Ave? |
| **Caller:** | 126. |
| **911:** | 126? |
| **Caller:** | Yeah.  They're deep. |

**[simultaneously]**

**911:**     Okay.

**911:**     126 French Ave, there's a green Mercedes shooting off guns.  Green.

**Caller:**     They're deep.

**911:**     They what?

**Caller:**     They got a Benz.  They're deep, like a lot of people, like, you know what I'm saying, they're in the Benz, and then 126, they got a gun, it's at the house.

**911:**     Okay.

**[simultaneously]**

**Caller:**     I live next door.

**911:**     Okay. Which, which, can you tell which person has, can you tell me which person has the gun? What they look like? Any clothing description?

**Caller:**     I'm not, I'm not sure 'cause all of 'em got a red shirt.  All of 'em.

**911:**     All of them have red shirts?

**Caller:**     Yeah.

**911:**     Okay.

**Caller:**     I can tell.

**911:**     Okay.

**Caller:**      But I can't remember any of the faces, you know what I'm saying?

**911:**     Yep. Um,

**Caller:**     I just make sure everything is set [inaudible],

**911:**     Okay. How many gunshots, do you know how many shots they shot, they fired off?

**Caller:**     Huh?

**[simultaneously]**

**911:**        How many gun shots did they shoot off?

**Caller:**     Um, they got a 38 cause they shoot, they shoot two times.

**911:**        They shot three times?

**Caller:**     Two times.

**911:**        Two times?

**Caller:**     with a thirty-eight

**911:**        Two times with a thirty-eight?

**Caller:**     Yep.

**911:**        Ok.  All right, we'll send somebody out there to check 'em, ok?

**Caller:**     Yeah, I ain't going, I ain't gonna be out there.

**911:**        No, I know.  I know.

**Caller:**     You know what I'm saying? I just call you guys [inaudible]

**911:**        Yeah, yeah, if we have to though we can call you back though, right?  Just in case
               we need to ask you anything?

**Caller:**     All right.

**911:**        Ok.  6-3-1-1-ah-2-3-9-4?

**Caller:**     Yup.

**911:**        Ok.

**Caller:**     All right.

**911:**        All right, thank you.

        **UM:**        9-1-1, this call is recorded, what is your emergency?
        **UF:**        I need an ambulance at...

| UM: | Let me connect you over to medical, ma'am. |
|---|---|
| UF: | Thank you. |
| UM: | Hold on. |
| UF: | Mmhmm. |
| UM: | 7-6 to Brockton. |
| UM: | Go ahead. |
| UM: | Okay, ah, located the child, clear it 10-5, we're riding up 31 to the area of North Main and Elliot. One adult female. 137-2-2-5 the mileage. |
| UM: | 0-0-12? |
| UM: | Officer Robert Smith.... |
| [Pause] | |
| UM: | Officer Robert Smith, 8-4-3. |

**Dispatch 1:**    8-2-9?

**Hyland:**    Come in, sir, we're at the park.

**Dispatch 1:**    French Ave. Blue Mercedes, ah, for gun shots. Or, green Mercedes. Firing, ah, weapons out of the car. 126 French Ave.

**Hyland:**    Received from Oak Street.

**Dispatch 1:**    South Impact, are you on the road?

**Shanks:**    We'll be clear in a second. Go ahead.

**Dispatch 1:**    We have a green Mercedes down on French Ave firing off, ah, weapons.

**Shanks:**    A green Mercedes on French Ave? Okay.

**[Pause]**

| UM: | Ah, cancel that. |
|---|---|
| Dispatch 2: | Brockton 4 to 12, Officer Robert Smith, 8-43. |
| UM: | Go ahead. |
| Dispatch 2: | All right, sir. |

**Dispatch 1:**    Units going to french Ave, ah, the green Mercedes is still there, it's out front. Ah, the caller thinks they live there. All parties involved have red shirts on and there were, ah, two shots, I believe, two shots fired.

**Shanks:**    We have that.

**Hyland:**    2-9 has it as well.

| | |
|---|---|
| **UM:** | South door. |
| **Hyland:** | Brockton, 8-2-9, going out. |
| **Dispatch 1:** | Ok, do you want a twenty? |
| **Hyland:** | Negative, thank you. |
| **Nazaire:** | Brockton, put 1-3 out with them. |
| **Dispatch 1:** | Ok. |
| **Hyland:** | Brockton, the Mercedes has Mass Reg 2-2-Yankee-Kilo-3-1. |
| **Hyland:** | Keith are you still in the garage? |
| **Shanks:** | Yeah. |
| **Hyland:** | I'll be right there. |
| **UM:** | The door's open. |
| **UM:** | 8-7-7 to a street supervisor. |
| **[Pause]** | |
| **Hallisy:** | Ok. Ah, someone calling a street sup? |
| **UM:** | Channel two, please. |
| **Dispatch 1:** | 8-2-9? |
| **[Pause]** | |
| **Dispatch 1:** | 8-2-9 or 8-1-3? |
| **UM:** | Go ahead. |
| **Dispatch 1:** | It comes back active on a Mercedes, green. Carmen Andrade out of Martland Ave. |
| **Benvie:** | Joe, you know who called this in? |

**Dispatch 2:**  Standby, Officer Benvie, let me check....

**[Pause]**

**Dispatch 2:**  Officer Benvie?

**Benvie:**  Go ahead.

**Dispatch 2:**  Called in by a neighbor. We do have a call back.

**Benvie:**  Yeah, can you call him back? We'd like to talk to him.

**[Pause]**

**Benvie:**  Joe, assign a case number, we've got one in custody. We have a code 4.

**Dispatch 2:**  All right, sir.

**Dispatch 2:**  Officer Benvie, nextel please, Officer Benvie.

**Benvie:**  Standby.

**Benvie:**  Officer Pizzi?

**Dispatch 2:**  Go ahead, sir.

**Benvie:**  Just want to verify 5-0-8-6-3-1-2-3-9-4.

**Dispatch 2:**  Standby, Officer Benvie, I'm on another screen right now.

**[Pause]**

**Dispatch 2:**  Officer Benvie?

**Benvie:**  Go ahead.

**Benvie:**  Yeah, Joe, I just want to verify that I'm at 5-0-8...standby.

**[Pause - Background Noise]**

UM:    7-7 to Brockton.
UM:    33 and suspect just pulled up, two on the drive. I'll get back to you.
UM:    Brockton, give us a signal 20 at, ah, Packard and Main, we're out with a
       vehicle that has that gun.

**Dispatch 1:** 20 on 1, 20 on 1.

**Dispatch 1:** Any units at 827 Main on two?...

**[Pause]**

**Dispatch 1:** All right, you're talking about Packard and Main?

**UM:** Okay.

**UM:** Yeah, we talked to the 33, but we're out with them right now....

**[Pause]**

**UM:** Yup, we went out with them, we talked to them, there was no pointing a weapon or anything like that. Now we just got to grab the car quick before it got away.

**UM:** Brockton you can cancel that 20.

**UM:** All right, sir, thank you.

**Benvie:** 2-niner-2

**Dispatch 2:** 29 come in....

**[Pause]**

**Dispatch 2:** 8-2-9 come in.

**Benvie:** Joe, you got a status on this, ah, Mercedes 2-2-Y-Yankee-K-Kilo-3-1? 2-2-Y-K-3-1?

**Dispatch 2:** Showing it active. It's out of, ah, Martland Ave, Brockton. To a Carmen Andrade. Passed inspection.

**Dispatch 2:** Brockton alternate to 800.

**[Pause]**

**Dispatch 2:** Brockton alternate to 800.

**UF:** 800 ready to copy

**Dispatch 2:** 10-14, stolen, recovered motor vehicle; be from Mass reg 22-A-alpha-T-tango-23; that's 2-2-Alpha-Tango-2-3. That's on a '97 Ford Escort, color red. It's located at 22 Pleasant Street, 2-2 Pleasant. Your cruiser will be 8-7-6, log time of 0-0-3-6.

**UF:** Sir, that was 60 pleasant?

**Dispatch 2:** Twenty-two.

**UF:** I'm sorry you kept cutting out, what's the address again?

**Dispatch 2:** 2-2 Pleasant Street

**[Pause]**

**Dispatch 1:** Packard and Main?

**Dispatch 1:** The, ah, the caller from earlier is now stating two males just ran into the apartment, you guys were in at 827 Main. She ran upstairs.

**UM:** 7-6 to 1.

Page 8 of 10

| | |
|---|---|
| UM: | Go ahead. |
| UM: | Can you call fire, there's a man's down over here where I'm at. At 2-2 Pleasant, complaining of a leg injury. |
| UM: | All right. |
| Shanks: | Go ahead on French. |
| Shanks: | 827 Main, what floor was it? |
| UM: | Brockton, 8-3-1 or 8-3-9 back on 827 Main |
| Dispatch 2: | Received, you're on two, sir. |

**Benvie:** 2-9 to a street supervisor?

**Hallisy:** Go ahead, I'm in the station.

**Benvie:** Please.

**Hallisy:** Okay, repeat.

**Dispatch 1:** Channel two, Lieu.

**Benvie:** Yes sir. We got a, ah, vehicle, ah, got a 10-12 out of it with a code 4, it's parked up on the sidewalk, creating a hazard. The owner's not around. Is it all right for a 10-12?

**Hallisy:** Okay on two. Go ahead with it.

**Benvie:** Sir we got a, ah, 10-12 out of a vehicle that's parked up on the sidewalk creating a hazard. We can't find the owner. Is it all right for a 10-12?

**Hallisy:** 10-4?

**Benvie:** My mistake, sorry for a tow. Joe, you copy that?

**Dispatch 2:** Yes sir, I do. Brockton alternate to 800?

**UF:** Ready to copy

**Dispatch 2:** Yes, ma'am. 10-14. Ah, motor vehicle hazard for Mass reg 2-2-Y-Yankee K-Kilo-3-1. That's on a '93 Mercedes, color green, it is located at Packard and Main, Packard and Main. Your cruiser will be, ah, Officer Benvie, are you going to handle this or 8-3-9?

**UF:** What's the last two letters of the license plate, please?

**Dispatch 2:** 800 standby, please.

**Dispatch 2:** 8-29, Officer Benvie on two.

**Hyland:** Go for Benvie.

**Dispatch 2:** All right, is this going to be your tow, sir, or 8-3-9's?

**Hyland:** 8-2-9, I'm out with it.

**Dispatch 2:** All right.

**Dispatch 2:** 800?

**UF:** Ready.

**Dispatch 2:** Plate number is 2-2-Yankee-Kilo-3-1, Mass 2-2-Yankee-Kilo-3-1. It's on a '93 Mercedes, color green. It's located at Packard and Main, Packard and Main Streets. Cruiser will be 8-2-9. Log time of 0-0-4-7.

**UF:** Received.

**End - Time 16min 48 sec.**

| Offense/Incident | | BROCKTON POLICE DEPARTMENT | | Case No. | |
|---|---|---|---|---|---|
| UNL POSS FIREARM | | ARREST REPORT | | 05008637 | |

| Offense Date and Time | Day | Arrest Date and Time | Day | Domestic Violence?! |
|---|---|---|---|---|
| 07/17/2005    00:30 | Sun | 07/17/2005    00:30 | Sun | NO |

| Location of Offense | Apt | Sector | Wrd | Prec | Arresting Officer |
|---|---|---|---|---|---|
| 126/FRENCH AV | | SW | 3 | 3B | HYLAND, THOMAS |

| Defendant's Name | | Sex | Race | Hgt | Wgt | D.O.B. | | A/J |
|---|---|---|---|---|---|---|---|---|
| RUIDIAZ        FLORENTINO | | M | B | 600 | 190 | 10/04/1980 | | ADULT |

| Defendant's Address | Social Security No. |
|---|---|
| 126/FRENCH AV BROCKTON MA | 010627297 |

| Offense(s) Charged    A | B | C |
|---|---|---|
| UNL POSS FIREARM      UNL POSS AMMUNITIO | | |

| Weapon(s) Used | Location of Arrest |
|---|---|
| .357 MAGNUM | 126/FRENCH AV |

| Type of Property | Make | Model | Color 1 | Color 2 | Value |
|---|---|---|---|---|---|
| FIREARMS/ACCESSORI | ROSSI | .357 MAGNU | BLK | SIL | $ |

| Type of Property | Make | Model | Color 1 | Color 2 | Value |
|---|---|---|---|---|---|
| FIREARMS/ACCESSORI | S&W, CCI | .357,38SPL | SIL | BRZ | $ |

| Witness 1 | | Sex | Race | D.O.B | |
|---|---|---|---|---|---|
| HYLAND        THOMAS | | U | U | | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| BROCKTON POLICE DEPT | | 508 941 0200 |

| Witness 2 | | Sex | Race | D.O.B | |
|---|---|---|---|---|---|
| BENVIE        BRIAN | | U | U | | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| BROCKTON POLICE DEPT | | 508 941 0200 |

| Witness 3 | | Sex | Race | D.O.B | |
|---|---|---|---|---|---|
| CARDE        SAMUEL | | U | U | | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| BROCKTON POLICE DEPT | | 508 941 0200 |

| Witness 4 | | Sex | Race | D.O.B | |
|---|---|---|---|---|---|
| PAUL        NAZAIRE | | U | U | | |

| Residence Address | Res Telephone | Bus Telephone |
|---|---|---|
| BROCKTON POLICE DEPT | | 508 941 0200 |

| State & Reg. | Year | Make | Model | Color | Vehicle ID Number | Status |
|---|---|---|---|---|---|---|
| MA 22YK31 | 93 | MERZ | 300 | GRN | WDBEB28E1PB928960 | |

Narrative:

0068

```
· Offense/Incident      !                              !    Case No.
                        !     BROCKTON POLICE DEPARTMENT !
  UNL POSS FIREARM      !           ARREST REPORT       !       05008637
```

1 !      Officer Benvie and I, Officer Hyland, were assigned to the impact !
2 ! shift on 7/17/05 when we were dispatched to 126 French Av for reports !
3 ! of gunshots. We were informed from the dispatcher that gunshots were !
4 ! coming from a green Mercedes parked in front of 126 French Av. We
5 ! saw the green Mercedes in front of 126 French Av when we arrived.
6 ! The passenger door to the vehicle was open. Officer Benvie and I
7 ! approached the open door and illuminated the interior of the vehicle
8 ! with our flashlights. I saw Defendant Florentino Ruidiaz sitting in
9 ! the front passenger seat. His head was cradled awkwardly against the
10 ! head rest and his arms were wrapped around his torso. His eyes were
11 ! closed. I feared he may have been shot.
12 !      I touched Defendant Ruidiaz's right shoulder and asked if he was
13 ! okay. He replied, "You fucking okay?" belligerently. This response
14 ! both surprised me and heightened my suspicion that Defendant Ruidiaz
15 ! could, in fact, be armed and dangerous. I took hold of Defendant
16 ! Ruidiaz's right forearm and asked him to exit the vehicle. I wanted
17 ! to pat-frisk Defendant Ruidiaz for weapons. I felt muscular tension
18 ! in Defendant Ruidiaz's forearm as he exclaimed, "What the fuck do you
19 ! want me out of the car for!" I pulled Defendant Ruidiaz out of the
20 ! vehicle, a green Mercedes bearing MA reg# 22YK31, and guided him to
21 ! the pavement. Officer Benvie took hold of Defendant Ruidiaz's left
22 ! arm while Detective Nazaire Paul pat-frisked the subject. Detective
23 ! Paul found a silver .357 Magnum tucked in the front waistband of
24 ! Defendant Ruidiaz's pants. I immediately handcuffed (DL) Defendant
25 ! Ruidiaz and placed him in the rear of my cruiser. Detective Paul
26 ! handed the .357 to Detective Carde. The handgun was fully-loaded with
27 ! 6 live rounds. Detective Carde unloaded the handgun and gave it to me. !
28 !      I checked the yards and street around the Mercedes for ballistic
29 ! evidence, but none was found. Officer Benvie conveyed to Lieutenant
30 ! Hallisey that the vehicle was posing a hazard, parked so as to block
31 ! the sidewalk, and requested the vehicle be towed. He also informed
32 ! Lieutenant Hallisey that the armed defendant was found in the vehicle
33 ! and no operator was available to move it. Lieutenant Hallisey
34 ! authorized the tow of the Mercedes.
35 !      I advised Defendant Ruidiaz of his Miranda Rights while en route
36 ! to the police station at 7 Commercial St. Defendant Ruidiaz
37 ! acknowledged understanding these rights by saying, "Yeah. No shit."
38 ! I asked Defendant Ruidiaz where he got the handgun. Defendnat Ruidiaz
39 ! exclaimed, "You had no probable cause to search me. I'm gonna beat
40 ! this shit. I'll get a year mandatory at most! I'll do the year."
41 !      We arrived at 7 Commercial St and escorted Defendant Ruidiaz from !
42 ! the cruiser to the booking room. While en route to the booking room,
43 ! Officer Benvie asked Defendant Ruidiaz why he was carrying the gun.
44 ! Defendant Ruidiaz reached around and pulled his shirt over his belly.
45 ! I saw numerous scars. He replied, "I've been stabbed. Why do you
46 ! think?" Defendant Ruidiaz was booked without further incident.
47 !      Upon closer examination of the hangun and its rounds, I found
48 ! the gun to be manufactured by INTERARMS. Three of the six rounds were
49 ! hollow-point CCI .357 Magnum rounds. The other three were S & W .38
50 ! Special rounds. The .357 Magnum handgun had a serial number of:
51 ! 074426. I querried this number via LEAPS to make sure the firearm was

| Offense/Incident | | Case No. |
|---|---|---|
| | BROCKTON POLICE DEPARTMENT | |
| UNL POSS FIREARM | ARREST REPORT | 05008637 |

| 52 | not stolen. It was not found to be stolen. The handgun and the |
| 53 | ammunition was turned over to Brockton CID to be held as evidence for |
| 54 | court. |

Signed under the pains & penalties of perjury. (Arresting Officer Signature)

| Report Date | Supervisors Signature |
|---|---|
| 7-17-05 | |

1

1 - 45

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
vs.                              )  CRIMINAL ACTION NO.
                                 )  05-10214-MLW
FLORENTINO RUIDIAZ, JR.,         )
                                 )
            Defendant.           )


        THE VIDEOTAPED DEPOSITION OF BRIAN BENVIE, held

pursuant to Order, and the applicable provisions of the

Federal Rules of Criminal Procedure, before Jeffrey Mocanu a

Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the offices of the United

States Attorney, 1 Courthouse Way, Boston, Massachusetts, on

Wednesday, July 19, 2006, commencing at 2:23 p.m.



2

APPEARANCES:

For the Plaintiff:

        JAMES E. ARNOLD, ESQ.
        SUSAN M. POSWISTILO, ESQ.
        Assistant U.S. Attorneys
        Office of the United States Attorney
        1 Courthouse Way
        Boston, MA  02210
        (617) 748-3100

For the Defendant:

        ROBERT SINSHEIMER, ESQ.
        Denner & Associates
        Four Longfello Pl
        Boston, MA  02114


Also Present:

        Matthew Stavris, Paralegal

        S/A Sheila O'Hara

        S/A Jim Mattson

        Florentino Ruidiaz, Jr.

3

I N D E X

WITNESS:                                                    PAGE

Brian Benvie

   (by Mr. Arnold)                                    6/37/43

   (by Mr. Sinsheimer)                                  28/40

| EXHIBIT | DESCRIPTION | | PAGE |
|---------|-------------|----|----|
| No. 5 | Photograph | 11 | 13 |
| No. 6 | Notebook | 25 | 27 |
| No. 7 | Arrest report and booking sheet | 31 | -- |

4

1              P R O C E E D I N G S

2                                          (2:23 p.m.)

3        B R I A N   B E N V I E, having been sworn by a Notary

4        Public to tell the truth, the whole truth and nothing

5        but the truth, testified upon his oath as follows:

6              EXAMINATION BY MR. ARNOLD:

7        Q     Will you please state your name and spell your

8    last name?

9        A     Brian Benvie.

10             MR. SINSHEIMER:  Excuse me, Mr. Arnold.  I didn't

11   realize you were going to begin by just asking questions.  I

12   mean, I'd like to make a statement for the record, if I may,

13   please.

14             MR. ARNOLD:  Sure.

15             MR. SINSHEIMER:  Thank you.  First of all,

16   obviously, there's no judge here, so I think we need to have

17   a method of objecting and my proposal is a common one that

18   all objections, save to the form of the question, be

19   reserved until the time of trial.  Do you have any problem

20   with that?

21             MR. ARNOLD:  I would prefer that you state your

22   objection on the record now and then the witness will answer

23   and then it will be redacted.

24             MR. SINSHEIMER:  Well, I'm glad I put it on the

25   record then.  I'm not sure I agree that that's necessary,

*APEX Reporting*
(617) 426-3077

5

1  but I will -- I'm certainly not going to argue objections on

2  the record, but if there's an objection, I'll do my best to

3  make them.  I still wish to reserve all my objections to the

4  time of trial, understanding you oppose that, except as to

5  the form, which I agree.

6            MR. ARNOLD:  Understood.

7            MR. SINSHEIMER:  The second thing I wanted to

8  point out is that this order entered before I became counsel

9  for Mr. Ruidiaz, so I just -- I didn't go back and try to

10 contest it, but I just emphasize that this is pursuant to an

11 order, that we never sent it to.  My client is here because

12 he has to be here, for no other purpose at this juncture.

13 And I think in light of the fact that we might have

14 considered calling this witness for suppression type

15 purposes, that that might be an issue that comes up at some

16 point in the course of this deposition.

17           MR. ARNOLD:  That's fine.  Anything else?

18           MR. SINSHEIMER:  Thank you.  Thank you for giving

19 me the opportunity.

20           MS. POSWISTILO:  Reswear him?

21           MR. ARNOLD:  Yeah.  I'd like -- do you mind if we

22 have him re -- so that -- you got your objections before the

23 deposition started, but do you mind now for clarity of

24 purpose, in terms of the trial transcript, that we have the

25 witness resworn?

6

1        MR. SINSHEIMER:  Not at all, but I mean he was

2   sworn.  The only reason I -- I didn't realize you weren't

3   going to make any statement and you were just going to start

4   right in like it's a courtroom, so I felt an obligation to

5   interrupt.  I don't like to interrupt normally, but.

6             MR. ARNOLD:  Okay.

7             MR. SINSHEIMER:  Yeah, you want to swear him

8   again?

9             MR. ARNOLD:  Yes.

10            MR. SINSHEIMER:  Start all over?

11            MR. ARNOLD:  Yeah.

12            MR. SINSHEIMER:  I have no problem with that.

13            MR. ARNOLD:  Great.

14       B R I A N   B E N V I E, having been sworn by a Notary

15       Public to tell the truth, the whole truth and nothing

16       but the truth, testified upon his oath as follows:

17            EXAMINATION BY MR. ARNOLD:

18       Q    Will you please state your name for the record and

19   spell your last name?

20       A    Officer Brian Benvie, B-e-n-v-i-e.

21       Q    Officer Benvie, where are you currently employed?

22       A    Brockton Police Department.

23       Q    And how long have you been employed at the

24   Brockton Police Department?

25       A    Almost ten years.

7

1    Q    Were you on duty the night of July 16th, 2005,

2  morning of July 17th, 2005?

3    A    Yes, I was.

4    Q    Officer Benvie, what shift were you on that night?

5    A    We were working an impact shift.

6    Q    What is the impact shift?

7    A    Impact shift is a shift designed to specifically

8  target Priority 1 calls.

9         MR. SINSHEIMER:  Objection, move to strike.

10   Q    BY MR. ARNOLD:  And what are Priority 1 calls?

11   A    Priority 1 calls are calls that are in progress,

12 B&Es, gunshots, rape in progress type things.  No reports.

13   Q    Who was your partner during that impact shift on

14 the night of July 16th, morning of July 17th, 2005?

15   A    Officer Thomas Highland.

16   Q    What hours were you and Officer Highland on duty

17 on the impact shift?

18   A    I believe it was 2000 to zero four.

19   Q    During the impact shift on the morning of July

20 17th, 2005, did you have a reason to go to 126 French Avenue

21 in Brockton, Massachusetts?

22   A    Yes, we did.

23   Q    Why did you go to 126 French Avenue?

24   A    Dispatch ---

25         MR. SINSHEIMER:  Ah -- well, I don't object to the

*APEX Reporting*
(617) 426-3077

1  form of the question, but since, you know, there's no judge

2  here, if it calls for hearsay answer, I'm going to preserve

3  any rights I may have.

4          Go ahead.

5      A    Dispatch called us for a call of gunshots at that

6  address, 126 French Ave.

7          MR. SINSHEIMER:  Move to strike.

8      Q    BY MR. ARNOLD:  What other ---

9          MR. SINSHEIMER:  Move to -- I move to strike for

10 trial, not necessarily for suppression.  We better sort of

11 make that -- move to strike for trial.

12     Q    BY MR. ARNOLD:  Did dispatch provide any

13 additional information to you, other than gunshots were

14 being fired at 126 French Avenue?

15     A    Yes.

16         MR. SINSHEIMER:  Objection.

17     A    He said that -- yes.  He said there was a green

18 Mercedes parked out in front of the house and was firing.

19     Q    BY MR. ARNOLD:  Approximately, what time was it

20 when you received the dispatch call?

21     A    Say roughly around 12:30.

22     Q    Now were you familiar with the area around

23 126 French Avenue?

24     A    Yes.

25     Q    What's the basis for your familiarity with that

1  area?

2      A    Prior calls.  That's one of the areas ---

3           MR. SINSHEIMER:  Objection.

4      A    --- targeted ---

5           MR. SINSHEIMER:  Oops, sorry.  Go ahead.  I

6  apologize.

7      A    Prior calls.  It is a, one of the areas targeted

8  for the south cruiser on the impact shift.  It's an area

9  known for drugs, prostitution, guns, gang, gang related

10 violence.

11          MR. SINSHEIMER:  I object and move to strike.  I

12 didn't object to the question because I thought the answer

13 was going to be routine patrol.  I think the question was:

14 How are you familiar with the area?  I move to strike the

15 response, which is highly prejudicial and unfair.

16     Q    BY MR. ARNOLD:  In lieu of the objection, what

17 kind of -- based on your familiarity with the area, what

18 kind of area is it?

19     A    It's a high-crime area.

20          MR. SINSHEIMER:  Objection, move to strike.

21     Q    BY MR. ARNOLD:  Approximately how long did it take

22 from the time that you received the dispatch call until you

23 arrived with Officer Highland as 126 French Avenue?

24     A    Five minutes, tops.  We were on one side of the

25 city and it doesn't take that long to get to the other side.

10

1   So roughly five minutes.

2        Q    I may have asked you this, but approximately what

3   time was it when you received the original dispatch call?

4        A    I believe it was around 12:30.

5        Q    When you arrived at 126 French Avenue, what did

6   you see?

7        A    There was a green Mercedes parked in front of

8   126 French Ave.  It was parked on the -- facing the wrong

9   direction.  It was partially on the sidewalk and the

10  passenger door was open, all the way open.

11       Q    And could you see an individual in the vehicle at

12  that time?

13       A    No, I couldn't.

14       Q    I want to show you what has been marked for

15  identification purposes as Government's Exhibit 5.

16                          (The document referred to was

17                          marked for identification as

18                          Government's Exhibit No. 5.)

19       Q    BY MR. ARNOLD:  What is this?

20       A    This is 126 French Ave.

21       Q    Is this a fair and accurate depiction of the

22  street in front of 126 French Avenue?

23       A    Yes, sir.

24       Q    Now I'd like to show you what's an enlargement of

25  Govern -- mh?

11

1          (Pause.)

2          MR. ARNOLD:  I'm going to move to admit Government

3   Exhibit 5.

4          MR. SINSHEIMER:  At this point, the rec -- it does

5   -- you haven't said anything about the car and the testimony

6   is only that it's a fair and accurate representation of the

7   location.  I do think that before I can assent, we need to

8   hear something about what this car is.

9      Q    BY MR. ARNOLD:  Looking at the vehicle that's

10  depicted in Government Exhibit 5, was that vehicle -- do you

11  know -- do you recall whether that vehicle was present?

12     A    I don't recall that, no.

13     Q    But for the vehicle that is appearing in

14  Government Exhibit 5, is it a fair and accurate depiction of

15  what you saw?  Obviously, it doesn't have the green

16  Mercedes.

17     A    Yes.

18     Q    And it was nighttime?

19     A    It was nighttime, yes.

20     Q    But is it an accurate depiction of the street in

21  front of 125 French -- 126 French Avenue?

22     A    Yes.

23          MR. ARNOLD:  And I'd move to admit.

24          MR. SINSHEIMER:  No objection.

25                    (Government's Exhibit No. 5 marked

12

1          for identification received into

2          evidence.)

3     Q    BY MR. ARNOLD:  Drawing your attention to the

4  enlargement of Government Exhibit 5, if you would, would you

5  show where the green Mercedes was at the time that you and

6  Officer Highland arrived?

7     A    The green Mercedes is around in this area, right

8  here.  We came from this way, from left to right.  The green

9  Mercedes was parked here, partially on this sidewalk area,

10  and it was facing in this direction, and the passenger door

11  was wide open.

12    Q    Okay.  Now, for the record purposes, when you say

13  that it was parked right here, you're reflecting in front of

14  the yellow house; is that correct?

15    A    That's correct, sir.

16    Q    Okay.  And it was facing the same direction as the

17  car that's in Government Exhibit 5 or in the opposite

18  direction?

19    A    The opposite direction.

20    Q    And how was it parked?

21    A    It was parked -- it was more parallel than it was

22  sticking out, but it was partially on the sidewalk.

23    Q    And you indicated that a door was open.  Which

24  door was open in the green Mercedes?

25    A    The passenger side door, front passenger.

13

1    Q    And how far out into the street was the passenger
2  door open?

3    A    That door was open all the way, so it was in the
4  travel lane.

5    Q    When you and Officer Highland arrived, did you
6  have your flashing lights going?

7    A    I don't remember having the lights going, but for
8  tactical purposes, I would have shut them off.

9         MR. SINSHEIMER:  Move strike anything past, "I
10  don't remember."  That was the answer to the question.

11   Q    BY MR. ARNOLD:  Was your siren going?

12   A    No.

13   Q    Why not?

14   A    Normally on a call like that, you don't have the
15  siren or the lights going.  You don't want to alert the
16  suspect that you're coming down the street, so he doesn't
17  run off on you.

18   Q    What happened next?

19   A    I pulled up to the rear of the vehicle, I parked
20  to the rear of the green Mercedes.  I got out.  I was the
21  driver, I got out, I went up, shined my light into the
22  passenger compartment.  I saw a black male in there.  He
23  appeared to be -- he appeared to be dead, and I turned
24  around and actually said that to Officer Highland.  I said,
25  I think this guy is dead.

APEX Reporting
(617) 426-3077

14

1      MR. SINSHEIMER:  Objection.  Move to strike.

2  Anything past "appeared to be dead."

3      Q   BY MR. ARNOLD:  Will you describe how the

4  individual in the vehicle was situated that led you to

5  believe that the individual appeared to be dead?

6      A   He was in an awkward position in the seat and his

7  head was tilted, his mouth was open.  When I shined my light

8  on him, which is a fairly bright light, there was no

9  response.  And then at that point I told Officer Highland

10  that this guy looks like he's dead.  And Officer ---

11      MR. SINSHEIMER:  Move to strike, again.

12      A   Then Officer Highland came up to the vehicle, he

13  shined his light ---

14      MR. SINSHEIMER:  Objection.  Objection.  Now I'm

15  objecting on the grounds, I mean, it's unresponsive.

16  There's no judge here, but maybe we should put another

17  question, respectfully.

18      MR. ARNOLD:  Fine.

19      MR. SINSHEIMER:  Thank you.

20      Q   BY MR. ARNOLD:  After you saw -- when you shone --

21  when you shone your flashlight on the individual, did the

22  individual move?

23      A   No.

24      Q   Did his eyes open?

25      A   No.

1    Q    After you shone your flashlight on the individual

2  sitting in the passenger seat of the green Mercedes, what

3  did you do next?

4    A    That's when I turned around and I mentioned to

5  Officer Highland ---

6         MR. SINSHEIMER:  Objection.  Objection.

7    Q    BY MR. ARNOLD:  Continue.

8    A    --- that, hey, this guy appears to be dead.  And

9  by that time Officer Highland was at the passenger side of

10  the door.

11    Q    What happened next?

12    A    Officer Highland then, being the contact officer,

13  shone his light in on the suspect.  He asked him if he was

14  okay.  He nudged him on the shoulder.  He asked him if he

15  was okay.  From that point on, I don't know what the

16  response -- I didn't hear a response out of the -- out of

17  the person sitting in the front seat.  And then at that

18  point Officer Highland took him by the right arm, right

19  shoulder area, and pulled him out of the car and guided him

20  to the ground.

21    Q    When Officer Highland was having contact with the

22  individual in the vehicle, where were you physically?

23    A    I was to the rear of the driver -- of the -- not

24  the driver, of the passenger post of the car.  If there was

25  a second door, I don't remember if it was a two-door or a

16

1    four-door, but I would have been in that area, where the

2    second door was.

3        Q    And what response, if any, did you hear from the

4    individual in the car when Officer Highland made his

5    inquiry?

6        A    I didn't.  I didn't hear a response.

7        Q    As Officer -- you saw Officer Highland proceed to

8    remove the individual from the vehicle; is that correct?

9        A    Yes.

10       Q    And what did you do?

11       A    When I saw Officer Highland pull him out, I saw

12   his left arm was free and I grabbed his left arm, so he

13   couldn't make any movements with it.  I know Officer

14   Highland was tied up with doing whatever he was, he was

15   doing.

16       Q    And so you -- at that point in time you had the

17   individual's left arm?

18       A    Yes.

19       Q    Officer Highland had his right arm?

20       A    Yes.

21       Q    And was the individual standing or ---

22       A    No, he was on -- he was face down on the ground.

23       Q    What happened next?

24       A    Officer Paul, Officer Paul, another officer that

25   arrived on the scene, came up, pat frisked him around the

17

1   waistband, reached in and pulled out a gun, showed us the
2   gun.
3        Q    And what did Officer Paul do with the gun that he
4   pulled out from the individual's waistband?
5        A    I don't -- I don't recall what he did with the gun
6   at that time.
7        Q    What did you and Officer Highland do with the
8   individual after the gun was located from the waistband?
9        A    We placed him in handcuffs, then we escorted him
10  back to the cruiser.  We put him in the backseat of the
11  cruiser.
12       Q    Now, do you see the person in this room whom you
13  arrested at 126 French Avenue and who was in possession of
14  the gun?
15       A    Yes.
16            MR. SINSHEIMER:  Objection.
17       A    Yes.
18       Q    BY MR. ARNOLD:  Rephrase the question.  Do you see
19  the person in the room whom you arrested at 126 French
20  Avenue?
21       A    Yes.
22            MR. SINSHEIMER:  That objection, I still object.
23  I object solely on the grounds of suggestiveness that he was
24  -- five of us here.  There's no opportunity for -- excuse
25  me, I'm counting.

18

1    MR. ARNOLD:   Seven.

2    MR. SINSHEIMER:   Seven or eight people.  He's

3  sitting next to me, he was brought in by marshals in front

4  of this witness, for what it's worth, and I'm making an

5  objection for the record.  That's all.

6    Q    BY MR. ARNOLD:   And why did you arrest the

7  defendant at that time?

8    A    For possession of a handgun and ammunition.

9    Q    At some point after you and Officer Highland

10  arrested the defendant, you said you put the defendant in

11  the cruiser; is that correct?

12    A    Yes.

13    Q    And what was the defendant's demeanor when you put

14  him in the cruiser?

15    A    He was agitated, he went from a state of calm to

16  being extremely agitated and then back to calm.  His

17  emotions were running all over.  He was -- he was thrashing

18  about in the backseat.  He was yelling, I'll do my one-year

19  mando, I'll my one year mando, I don't have a problem with

20  doing one year, one year is nothing to me, phrases like

21  that.

22    MR. SINSHEIMER:   I'll move to strike.   The

23  question was what his demeanor was, not what he was saying.

24    Q    BY MR. ARNOLD:   What did the defendant say?

25    MR. SINSHEIMER:   Objection, Mr. Arnold.

APEX Reporting
(617) 426-3077

19

1        Q   BY MR. ARNOLD:  What did the defendant say after

2    you put him in the cruiser?

3              MR. SINSHEIMER:  I understand that you don't think

4    it's a valid objection, but I'm objecting, again, just for.

5        Q   BY MR. ARNOLD:  Again, what did the defendant say?

6        A   He was -- he was yelling that he'll do his

7    one-year mando.

8              MR. SINSHEIMER:  Again, and I did object, but I

9    just -- what happened wasn't stopped.

10             Go ahead.  I'm sorry. I apologize, Officer.

11             THE WITNESS:  Oh, that's no problem.

12       Q   BY MR. ARNOLD:  Again, I'm going to ask, for the

13   record purposes, for clarity of the record, what did ---

14             MR. ARNOLD:  And your objection is noted.

15             MR. SINSHEIMER:  Thank you.

16       Q   BY MR. ARNOLD:  What did the defendant say after

17   being placed in the cruiser?

18       A   He was saying he'll do his one-year mando, he has

19   no problem with doing one year.  One year is nothing.

20             MR. SINSHEIMER:  Move to strike.

21       Q   BY MR. ARNOLD:  When the defendant said, I'll do

22   his one-year mando, what did you understand that to mean?

23       A   I understand that to mean that in the Commonwealth

24   of Massachusetts unlicensed possession of a firearm requires

25   a one-year mandatory prison sentence.

*APEX Reporting*
(617) 426-3077

                                                                20

1        MR. SINSHEIMER:  Move to strike.  I should have

2  objected to the question.  I ask it be stricken.  What his

3  understanding is, is totally irrelevant.

4        Q    BY MR. ARNOLD:  And, again, strictly for the

5  record purposes, the individual who -- I believe you

6  answered this question, but to make sure that you did, is --

7  do you recognize the individual whom you arrested that

8  night?

9             MR. SINSHEIMER:  I -- here, you mean?

10            MR. ARNOLD:  In this room.

11            MR. SINSHEIMER:  Yeah.  To be fair, I don't think

12  he did answer it and I object, vigorously.

13            MR. ARNOLD:  Duly noted.

14       Q    BY MR. ARNOLD:  Do you recognize the individual?

15       A    Yes.  Yes, I do.

16       Q    Is the individual in this room?

17       A    Yes, he is.

18       Q    And would you identify who that individual is?

19       A    This gentleman sitting to the left of the lawyer.

20            MR. ARNOLD:  And for purposes of the record, let

21  the record state that it's the defendant.

22            MR. SINSHEIMER:  It's the defendant.

23       Q    BY MR. ARNOLD:  At some point thereafter, after

24  you arrested the defendant, did you and Officer Highland

25  transport the defendant ---

                        APEX Reporting
                         (617) 426-3077

21

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | --- away from 126 French Avenue? |
| 3 | A | Yes, we did. |
| 4 | Q | And at the time of arrest or thereafter, was the |

5    defendant given his Miranda warnings?

6        A    He was.  On the way to the station Officer

7    Highland informed him of his Miranda rights.

8        Q    After the defend -- and did the defendant

9    acknowledge his Miranda rights?

10        A    He did.

11        Q    Do you recall how he acknowledged them?

12            MR. SINSHEIMER:  Objection.  I object.

13        A    No, I don't.  I know he did answer to it, though,

14    that he did answer, recognize them.

15        Q    BY MR. ARNOLD:  After receiving his Miranda

16    rights, did the defendant make any statements?

17            MR. SINSHEIMER:  Objection.  This objection is

18    based not on the form of the question or anything on the

19    fact that there's likely going to be a suppression motion,

20    this is putting the cart before the horse, so if you let me

21    have what we call a running objection, I won't beat the

22    record up any more.

23            MR. ARNOLD:  Why don't we do that?

24            MR. SINSHEIMER:  Okay.  So we are -- I'm objecting

25    to any statements until such time as I've had an opportunity

22

1   to make a motion to suppress any statements whatsoever, and

2   I don't have to say any more today. Those rights are not

3   waived, correct?

4            MR. ARNOLD:  Right.

5            MR. SINSHEIMER:  Thank you. All right.

6       Q   BY MR. ARNOLD: After receiving his Miranda

7   warning, did the defendant make any statements?

8       A   I asked him, when we got to the station, I asked

9   him why he was carrying the handgun. He reached around and

10  pulled up his shirt and said that he had been stabbed.  He

11  said, what do you think? I've been stabbed. And he showed

12  the scars that are on his torso.

13      Q   Did the defendant make any other statements?

14      A   He made some to Tom Highland, Officer Highland.

15  Without looking at the report to refresh my memory, I

16  couldn't -- I couldn't say what, exactly what they were.

17      Q   Now I want to draw your attention back to

18  126 French Avenue. After the defendant was arrested, what

19  else, if anything, did you do at the scene?

20      A   I got word from the alternate dispatcher ---

21           MR. SINSHEIMER:  Object. The question was, what

22  he did.  I'd object to that.

23      Q   BY MR. ARNOLD: What, if anything, did you do?

24      A   I got word from the alternate ---

25           MR. SINSHEIMER:  Objection.

23

1        A     --- dispatcher that there was an anonymous phone
2   call on the 911 tape.  They did have a phone number.  I got
3   the phone number from the dispatcher and I called that phone
4   number.  The person on the other end wouldn't identify
5   himself.  He wouldn't tell us where he was, but he did say
6   that he was watching us.  He said the person we have is the
7   correct person that was firing the shots.  And then he hung
8   up.

9              MR. SINSHEIMER:  I object, move to strike.

10       A     I wanted to ask him other questions so I called
11  him back.  He didn't answer the phone.  About two minutes
12  after that, after I hung up the phone, he called me back.  I
13  again tried to get his identity.  He said that he wouldn't
14  give up his identity.  He told me he was in the blue house
15  next door.  He gave the address.  I can't remember what the
16  address was.  He was in the basement apartment.  There were
17  two individuals in the driveway of this blue house, right
18  here, leaning up against a car.  I asked them if they owned
19  the house.  One of them did own the house.  I asked him if
20  he'd let me down into the cellar, into the basement and he
21  did, and there was, there was no one down there in the
22  basement.

23             MR. SINSHEIMER:  Move to strike the entire answer.
24       Q     BY MR. ARNOLD:  I want to show you what's been
25  marked as Government Exhibit 6.

*APEX Reporting*
(617) 426-3077

24

1                        (The document referred to was

2                        marked for identification as

3                        Government's Exhibit No. 6.)

4        Q    BY MR. ARNOLD:  What is this?

5        A    This is a copy of my notebook with the ---

6             MR. SINSHEIMER:  Marked for identification at this

7    juncture only?

8             MR. ARNOLD:  Marked for identification purposes

9    only.

10            MR. SINSHEIMER:  At this juncture.  Thank you.

11       A    This is a copy of my notebook that I carry.  It

12   does have a bunch of items redacted that does not -- that's

13   not related to this case.  The three numbers on the bottom

14   of the page are the witness number that I called, and then

15   the two people that were on the vehicle.

16       Q    BY MR. ARNOLD:  Now, do you normally carry a note

17   pad while on duty?

18       A    Yes, I do.

19       Q    And what do you use it for?

20       A    I use it to take notes.  I write down names, do

21   FIOs, birth dates, phone numbers.

22       Q    When you say FIO, what is that?

23       A    Field identification.  If we roll up on someone, a

24   bunch of youths hanging in the park, take down their names

25   when we encounter them, see if there are any outstanding

25

1   warrants, that type of thing.

2       Q     And you take down those notes at the time that

3   you're receiving the information?

4       A     Yes, I do.

5       Q     And do you keep your notebook thereafter in the

6   normal course of your duties?

7       A     Yes.

8       Q     And you indicated that there's other material

9   that's on the blacked-out portion of what's reflected as

10  Government's -- identified as Government Exhibit 6; is that

11  correct?

12      A     Yes.

13      Q     That pertains to another -- other investigation

14  not related to this matter; is that correct?

15      A     That's correct, sir.

16            MR. ARNOLD:   I'd move to admit Government

17  Exhibit 6 for purposes of the suppression hearing.

18            MR. SINSHEIMER:   Only?

19            MR. ARNOLD:   Only.

20            MR. SINSHEIMER:   I have no objection to it coming

21  in for the suppression hearing.   But I do object to coming

22  in at trial.

23            MR. ARNOLD:   Understood.

24            MR. SINSHEIMER:   And it hasn't been offered at

25  trial?

*APEX Reporting*
(617) 426-3077

26

1           MR. ARNOLD:  No.

2           MR. SINSHEIMER:  I understand.

3           MR. ARNOLD:  It's only being offered for purposes

4    ---

5           MR. SINSHEIMER:  I understand.

6           MR. ARNOLD:  --- of the suppression hearing.

7           MR. SINSHEIMER:  I know when I'm being redundant.

8    I apologize, but I want to be clear.

9                          (Government's Exhibit No. 6 marked

10                          for identification received into

11                          evidence.)

12   Q    BY MR. ARNOLD:  Now then, drawing your attention

13   to the first note, the first item that's listed on

14   Government Exhibit 6.

15   A    Yes.

16   Q    What does that read?

17          MR. SINSHEIMER:  Are we now, just again, doing

18   suppression?

19          MR. ARNOLD:  This is strictly for the suppression

20   hearing.

21          MR. SINSHEIMER:  No objection in that context.

22          MR. ARNOLD:  Thank you.

23          MR. SINSHEIMER:  Can I -- is that running now?

24   Are you done with your trial testimony?

25          MR. ARNOLD:  Yes.

27

1        MR. SINSHEIMER:  That's pretty clear.

2        Thank you.

3    A    First line says, witness, and then the phone

4    number 508-631-2394.

5    Q    BY MR. ARNOLD:  How did you get that information

6    that says, witness, and then the telephone number that you

7    just recited?

8    A    That number was relayed to me by the alternate

9    dispatcher.  He told me to call him.  He had a phone number

10   but he didn't want to put it out over the air.

11   Q    And what did you do then with that number?

12   A    I obviously, wrote it down, and then I called it.

13   Q    Now those other two names and numbers that are

14   listed ---

15   A    Yes.

16   Q    --- were those names and numbers also received

17   from dispatch?

18   A    No.  No, they weren't.

19   Q    Those were other individuals just in the area?

20   A    Just in the area.  Yes, sir.

21   Q    What happened to the green Mercedes after you

22   arrested the defendant?

23   A    Lieutenant Halisy authorized to tow it because it

24   was parked on the sidewalk, blocking a sidewalk, and there

25   wasn't a licensed operator to drive it away, so we towed it.

28

1              MR. ARNOLD:   That concludes the direct.

2              MR. SINSHEIMER:   What I'd like to do is I'd like

3    to ask some questions with respect to the suppression first,

4    which in fact in a normal case would be the more likely

5    order, we would have a suppression hearing prior to a trial.

6              MR. ARNOLD:   If you'll indicate when you're

7    switching to test -- round of questions that will be then

8    for trial purposes.

9              MR. SINSHEIMER:   Right.

10             MR. ARNOLD:   Okay.  So this is strictly for ---

11             MR. SINSHEIMER:   For now it's strictly ---

12             MR. ARNOLD:   It's my understanding that the

13   questions you are about to ask are strictly questions for a

14   suppression hearing?

15             MR. SINSHEIMER:   Correct.

16             MR. ARNOLD:   Okay.

17             MR. SINSHEIMER:   And then I will inform you, and I

18   may even start all over.

19             MR. ARNOLD:   Okay.

20             MR. SINSHEIMER:   All right.

21             EXAMINATION BY MR. SINSHEIMER:

22        Q    Now if I understand your testimony, Officer, you

23   were driving a cruiser, correct?

24        A    Yes.

25        Q    Was it marked or unmarked?

*APEX Reporting*
(617) 426-3077

29

1      A     Marked.

2      Q     And your partner is the author of the report?

3      A     Correct.

4      Q     The only report?

5      A     Yes.  I don't know if it's the only report.  He's

6   the author of ---

7      Q     A report?

8      A     --- a report.

9      Q     All right.  Let me show you what has a tag on it,

10  Government Exhibit 7 for identification and ask:  Can you

11  identify that document?

12     A     Yes.  This is the arrest report, along with the

13  booking sheet.

14                          (The document referred to was

15                          marked for identification as

16                          Government's Exhibit No. 7.)

17     Q     BY MR. SINSHEIMER:  And you didn't sign that, did

18  you?

19     A     I did not.  We don't sign -- I don't sign it.

20     Q     Well, the one who signed it, Officer Halisy,

21  correct?

22     A     That's Lieutenant.

23     Q     Oh, Lieutenant Halisy?

24     A     Lieutenant Halisy signed it, indicating that the

25  report was correct.

*APEX Reporting*
(617) 426-3077

1    Q    All right.  And Officer Highland prepared it?

2    A    He wrote it, yes.

3    Q    And you didn't write anything, other than what you

4    have on Exhibit 6, correct?

5    A    Correct.  Not a bit.

6    Q    And you used Officer Highland's report to refresh

7    your memory before you came in here today?

8    A    Somewhat, yes.

9    Q    You read it over within the last 24 hours,

10   correct?

11   A    Yes.

12   Q    Now, without any reports in front of you, that

13   evening, what you recall is you were dispatched because

14   somebody heard shots fired, correct?

15   A    Yes.

16   Q    You don't know who that was, do you?

17   A    No.

18   Q    And these numbers that you wrote down on Exhibit

19   6, you wrote them down after my client had already been

20   arrested, correct?

21   A    Yes.

22   Q    So you didn't have access to those numbers at the

23   time you were taking him out of the car?

24   A    No.

25   Q    And you didn't know who, if anyone, made a report

APEX Reporting
(617) 426-3077

31

1   to the police at the time you were taking him out of the

2   car?

3       A   I'm sorry?

4       Q   You had -- you didn't have any name of anyone that

5   reported any incident to the police at the time you were

6   taking my client out of the car?

7       A   Correct.

8       Q   All you knew is that there was a report, shots

9   fired in the area, right?

10      A   Yep.

11      Q   You got to the scene, correct?

12      A   Yes.

13      Q   Which is visualized in this exhibit?

14      A   Yes, sir.

15      Q   Meaning the location is visualized?

16      A   Mm-hm.

17      Q   You see a green Mercedes?  Right?

18      A   Yes, sir.

19      Q   And you see somebody in the passenger seat?

20      A   No, sir.  Not when we rolled up.

21      Q   Well, but at some point you see ---

22      A   Eventually, yes.

23      Q   --- him in the passenger seat?

24      A   Yes.

25      Q   And he's not committing any crimes at that time,

32

1   as far as you know?

2        A    As far as I know, no.

3        Q    In fact, you said you thought he was dead?

4        A    I did.  That's not a crime.

5        Q    Well, and -- well, whether he's dead or alive, he

6   was sitting there peacefully, right?

7        A    Yes.

8        Q    He didn't have any visible weapon to you, at the

9   time you pulled up, did he?

10       A    No.

11       Q    Didn't have any visible contraband of any kind at

12  the time you pulled up?

13       A    None whatsoever.

14       Q    And then somebody reached into the car and touches

15  him?  Right?

16       A    That's correct.

17       Q    That's Highland that does that?

18       A    Yes.

19       Q    And you see that with your own eyes?

20       A    I saw him reach in, yes.

21       Q    Where are you standing when Highland reaches into

22  the car?

23       A    Standing back, again, where the -- where a rear

24  passenger door would have been.  I was standing in that

25  area.

33

```
 1       Q    So if I understand it, you're behind the front
 2   passenger door?
 3       A    Yes.  Yeah.
 4       Q    All right.  And is it light or dark out?
 5       A    It was dark.
 6       Q    And when Highland touches the person -- and I
 7   would guess you visualized him reaching in, can you see that
 8   in your memory?
 9       A    Yes.
10       Q    What's he using, his left or right hand?
11       A    Oh, I don't know that.
12       Q    All right.  Which way is he facing?  Highland, I'm
13   talking about?
14       A    He's facing towards the passenger.
15       Q    All right.  And the -- what's the first reaction
16   you recall from the passenger?
17       A    I don't recall a reaction from the passenger.  I
18   couldn't see him.
19       Q    Couldn't see him.  Well, what's the first movement
20   that you recall?
21       A    From the passenger?
22       Q    The passenger.
23       A    Couldn't see the passenger.
24       Q    Well, at some point he's taken out of the car?
25       A    Well, that's the first movement I saw was ---
```

34

1        Q    All right.  When Highland grabs him and takes him
2    out of the car?
3        A    Yes.
4        Q    Okay.  And before that, he didn't do anything that
5    you recall seeing with your own eyes?  Is that true?
6        A    That's true.
7             MR. SINSHEIMER:  Give me 30 seconds.
8             (Pause.)
9        Q    BY MR. SINSHEIMER:  He was wearing a black shirt,
10   correct?
11       A    I don't remember what he was wearing.
12       Q    You don't remember, one way or the other?
13       A    No.
14       Q    Were you in the car when the -- in the cruiser,
15   I'm sorry, when the dispatch came over the air?
16       A    When they dispatched us?
17       Q    Yes.
18       A    Yes.
19       Q    Do you recall what, if any, description they gave
20   of alleged perpetrator?
21            MR. SINSHEIMER:  This is still for just
22   suppression.
23       Q    BY MR. SINSHEIMER:  Alleged?
24       A    At that time, no, I don't recall.
25       Q    You don't have any recollection whatsoever?

*APEX Reporting*
(617) 426-3077

35

1      A    No.

2      Q    If I refresh your recollection by saying someone

3   said something about red shirts, do you have any

4   recollection of that?

5      A    No.

6      Q    None whatsoever?

7      A    No.

8      Q    Now, as to -- after Mr. Ruidiaz is under arrest,

9   at some point you've testified on direct in the suppression

10  hearing that he was read his rights.  Do you recall that

11  testimony?

12     A    Yes.

13     Q    Just because you didn't read him his rights, did

14  you?

15     A    No, I didn't.

16     Q    And that ---

17          MR. ARNOLD:  Objection.  Just for purposes of the

18  record, the statement about the reading of the rights was

19  not testimony just for a suppression hearing, but was part

20  of his testimony on direct.

21          MR. SINSHEIMER:  Well, and I objected to it.

22          MR. ARNOLD:  Agreed.

23          MR. SINSHEIMER:  Right.  I respect that, though.

24  If it was, I'm not going to try to dispute that.

25     Q    BY MR. SINSHEIMER:  In any event, let me -- you

*APEX Reporting*
(617) 426-3077

1 | didn't personally read him his rights?

2 |     A    No, I didn't.

3 |     Q    Highland -- who did?  Officer Highland?

4 |     A    Officer Highland.

5 |     Q    There was the three of you alone in the cruiser at

6 | that time?

7 |     A    Yes.

8 |     Q    Was the cruiser moving?

9 |     A    Yes.

10 |     Q    Was my client behind a partition of some kind?

11 |     A    The partitions in the cruiser are half plexiglas,

12 | half wire cage, but, yes, he was behind those.

13 |     Q    Okay.  And were you driving or was Highland

14 | driving?

15 |     A    I was driving.

16 |     Q    And you don't remember the exact words, if any,

17 | that Mr. Ruidiaz used to acknowledge receipt of the rights?

18 |     A    No.

19 |     Q    In fact, your testimony really is, other than the

20 | fact that you allege it happened, you don't recall anything

21 | about the rights, correct?

22 |     A    That's correct.

23 |         MR. SINSHEIMER:   That's all I have of the

24 | suppression.

25 |         MR. ARNOLD:   Cross-examination on the suppression.

37

1            MR. SINSHEIMER:  Just on the suppression.

2            MR. ARNOLD:  On the suppression.

3            MR. SINSHEIMER:  Sure.

4            MR. ARNOLD:  Redirect.

5            EXAMINATION BY MR. ARNOLD:

6       Q    Quickly -- Officer Highland (sic), quickly review

7   what information you knew at the time that you and Officer

8   Highland appeared at 126 French Avenue?

9            MR. SINSHEIMER:  Objection to the word "knew."

10      Q    BY MR. ARNOLD:  --- what information you had in

11  your possession.

12      A    A green Mercedes.

13           MR. SINSHEIMER:  Information, I object again, but

14  that's okay.  I understand what you're doing.

15      A    A green Mercedes parked in front of 126 French

16  Ave. was firing a gun at the house.

17      Q    BY MR. ARNOLD:  What time of night?

18      A    About 12:30.

19      Q    What was the information you had about the area?

20      A    The information I had was a high-crime area based

21  on its statistics and prior knowledge of the area, and being

22  identified as one of the areas the impact shift ---

23           MR. SINSHEIMER:  I object, and move to strike

24  that.  I thought the question, information about the area,

25  meant that evening, not that general area.

38

1    Q    BY MR. ARNOLD:  On the basis of your experience as

2    a police officer with the Brockton Police Department,

3    functioning on the impact shift, what was your understanding

4    of the area at 126 French Avenue?

5        A    High-crime area.

6        Q    And when you say high crime, what crimes are you

7    referring to?

8        A    Gang related activities, violent crime, gunshots.

9    It's one of the areas identified that the impact shift is

10   supposed to patrol.

11       Q    Now, on cross-examination, defense counsel asked

12   of you whether the defendant was, to your knowledge, was

13   engaged in any illegal activity in the vehicle as you

14   approached.  Was the vehicle legally parked at 126 French

15   Avenue?

16       A    No, it was not.

17       Q    And the passenger door -- why was it illegally

18   parked?

19       A    It was parked on the -- partially on the sidewalk

20   and it was parked in the wrong direction.

21       Q    And additionally, was there a problem with the

22   passenger door?

23       A    The passenger door was wide open in the travel

24   lane.

25       Q    Turning to the advice of rights, defense counsel

*APEX Reporting*
(617) 426-3077

39

1  on cross-examination asked you questions about advice of

2  rights.  Is there anything that would refresh your

3  recollection about any answer given by the defendant after

4  his advice of rights were given?

5      A    Yes.  If I could read the report again?

6      Q    Showing you what's been marked as Government

7  Exhibit 7.

8          MR. SINSHEIMER:  Only for ID in suppression, I

9  believe.

10         MR. ARNOLD:  Yes.

11     Q    BY MR. ARNOLD:  Having reviewed Government's

12  Exhibit No. 7, does that refresh your recollection ---

13     A    Yes.

14     Q    --- about any statements made by the defendant

15  after receiving his advice of rights?

16     A    Yes, it does.

17     Q    And what did the defend -- what did the defendant

18  say after receiving his advice of rights?

19     A    He said, yeah, no shit.

20         MR. ARNOLD:  No further questions.

21         MR. SINSHEIMER:  I don't have anything else on

22  suppression.

23         MR. ARNOLD:  Okay.

24         MR. SINSHEIMER:  Let me ask a few.  I'm going to

25  try to do this as a separate kind of trial cross, okay?

40

1           MR. ARNOLD:  Okay.

2           EXAMINATION BY MR. SINSHEIMER:

3      Q    Officer, on the night that you assisted in the

4  arrest of Mr. Ruidiaz, you were dispatched to 126 French

5  Avenue ---

6      A    Yes.

7      Q    --- correct?

8      A    Yes, sir.

9      Q    When you arrived at 126 French Avenue, there

10 weren't any crimes being committed that you could see with

11 your own eyes, correct?

12     A    Other than the vehicle parked in the wrong

13 direction, up on the sidewalk with a door open, no.

14     Q    All right.  And -- well, that's a civil violation,

15 that's not a crime, is it?

16     A    It's a motor vehicle violation.

17     Q    All right.  And the -- and you didn't speak to

18 anyone before you approached the vehicle, did you?

19     A    No.

20     Q    And then you and your partner approached the

21 vehicle?

22     A    Yes, sir.

23     Q    And the person sitting in the passenger seat was

24 sitting there peacefully, correct?

25     A    Yes.

41

1     Q    And then your partner reached in and grabbed him,

2  right?

3     A    No, he reached in to check to see if he was okay.

4     Q    Yeah, but then very shortly thereafter he had him

5  on the ground, right?

6     A    That's correct.

7     Q    And you say at that time, and for the first time

8  you observed a weapon being taken from him?

9     A    I'm sorry, again?

10     Q    You observed a weapon being taken from him?

11     A    Yes.

12     Q    All right.  Now, how long between the time you

13  approached the vehicle and -- in seconds -- and the weapon

14  -- and you saw the weapon?

15          I'll withdraw it and I'll try it again.

16          How much time in seconds elapsed between when you

17  first approached the vehicle and you had him on the ground

18  and you saw the weapon?

19     A    In seconds?

20     Q    Yeah.  Approximately?

21     A    I'd have to say about, less than two minutes.

22     Q    Okay.  And in that time, another cruiser arrived,

23  correct?

24     A    I was not aware of another cruiser arriving.

25     Q    Well, but ---

42

| | | |
|---|---|---|
| 1 | A | It was at one point, yes, a cruiser did arrive. |
| 2 | Q | And you don't even remember that? |
| 3 | A | No. |
| 4 | Q | But you do recall that the person who actually |

removed the alleged weapon from my client was another

officer, right?

| | | |
|---|---|---|
| 7 | A | Yes. |
| 8 | Q | Not the one in your car? |
| 9 | A | Correct. |
| 10 | Q | Someone named Officer Paul? |
| 11 | A | Yes. |
| 12 | Q | Right? |
| 13 | A | Right. |
| 14 | Q | Now, how long was Paul there before the defendant |

was taken out of the car?

| | | |
|---|---|---|
| 16 | A | I don't know. |
| 17 | Q | You don't know any -- do you have any recollection |

what Paul did?

| | | |
|---|---|---|
| 19 | A | Up until -- before he took the weapon out of the |

waistband?

| | | |
|---|---|---|
| 21 | Q | That's what I meant.  That's what I meant. |
| 22 | A | No.  I have no recollection. |
| 23 | Q | All right.  Now, when you got to the scene, you |

knew you were looking for someone who was dressed in red,

correct?

```
                                                             43
 1        A    No.
 2        Q    It's your testimony you have no knowledge of that,
 3   whatsoever?
 4        A    That's correct.
 5             MR. SINSHEIMER:  No further questions.
 6             EXAMINATION BY MR. ARNOLD:
 7        Q    The information you had on hand was that shots had
 8   been fired from a green Mercedes; is that correct?
 9        A    Yes, sir.
10        Q    And when ---
11        A    In front of 126 French Avenue.
12        Q    In front of 126 French Avenue, and that came from
13   dispatch?
14        A    That came from dispatch, yes.
15        Q    And it was 12:30 at night?
16        A    12:30 at night, yes.
17        Q    And you shone the flashlight in originally at the
18   green Mercedes that was illegally parked, the defendant did
19   not move?
20        A    Yes.
21             MR. SINSHEIMER:  Object to the -- object to the
22   question.
23             MR. ARNOLD:  No further questions.
24             MR. SINSHEIMER:  I'm all set.
25             MR. ARNOLD:  We're done?
```

44

1        MR. SINSHEIMER:  Yes.

2        (Whereupon, the deposition was concluded at

3    3:01 p.m.)

45

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS )
                                                  )   SS.
COUNTY OF SUFFOLK                        )

I, Jeffrey H. Mocanu, a Court Reporter and Notary

Public, within and for the Commonwealth of Massachusetts, do

hereby certify that there came before me on this 19th day of

July, 2006, the person hereinbefore named, who was by me

duly sworn to tell the truth, the whole truth, and nothing

but the truth, concerning and touching the matter in

controversy in this cause; that he was thereupon examined

upon his oath, and his examination reduced to typewriting,

under my direction, and that this deposition transcript is a

true and accurate record of the testimony given by the

witness.

I further certify that I am not related to any of

the parties hereto or their counsel, and that I am in no way

interested in the outcome of said cause.

Dated at Boston, Massachusetts, this 1st day of

August, 2006.

Jeffrey H. Mocanu
NOTARY PUBLIC
My Commission Expires:
April 26, 2007

*APEX Reporting*
(617) 426-3077