UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America, ) | |
| ) | |
| v. ) | |
| ) | CRIMINAL NO. 05CR10214MLW |
| Florentino Ruidiaz, Jr. ) | |
| _____) | |

## DEFENDANT FLORENTINO RUIDIAZ'S MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS WEAPON AND AMMUNITION

STATEMENT OF FACTS

Around 12:30 AM on July 17, 2005 an anonymous person allegedly made a 911 emergency call to the police. (Ruidiaz Revised Transcript). This person remains unidentified and refuses to speak with police. (Report of Investigation by ATF, August 24, 2005, Bates #76); (Benvie Dep. at 23: 1-22). In fact, the caller hid from Officer Benvie when Benvie entered the house where the caller claimed he was located. (Benvie Dep. at 23:1-22). Police allegedly know only the phone number from which the 911 call was made. (Report of Investigation by ATF, August 24, 2005, Bates #76); (Benvie Dep. at 23:1-22); (Ruidiaz Revised Transcript at 4). They have not been able to determine the caller's name. (Ruidiaz Revised Transcript at 4); (Report of Investigation by ATF, August 24, 2005, Bates #76); (Benvie Dep. at 23:1-22). They have not confirmed where the alleged 911 caller lives. (Ruidiaz Revised Transcript at 4); (Report of Investigation by ATF, August 24, 2005, Bates #76); (Benvie Dep. at 23:1-22).

The recording of the 911 call reveals a somewhat inaudible person, slurring his words and contradicting himself. (Ruidiaz Tape Recording of 911 Emergency Call); (Ruidiaz Revised Transcript at 1). The Caller changed his description of the scene numerous times throughout the call. (Ruidiaz Revised Transcript). He first claimed he was outside at the time

shots were fired. (Ruidiaz Revised Transcript at 1). Two lines later he claimed he was inside his house. (Ruidiaz Revised Transcript at 1). He first stated that he did not know where the shots came from. (Ruidiaz Revised Transcript at 1). It is not until after shots were allegedly fired that he noticed a green Mercedes. (Ruidiaz Revised Transcript at 2). He again changed his story and decided that the shots had been fired from the Mercedes. (Ruidiaz Revised Transcript at 3). He changed his narrative one more time asserting that the gun was "at the house". (Ruidiaz Revised Transcript at 3). Caller also reported that there were a lot of people outside on French Avenue. (Ruidiaz Revised Transcript at 3). He claimed he could not identify a shooter because all the people were dressed in red. (Ruidiaz Revised Transcript at 3).

Officers Hyland, Benvie and Paul were dispatched to 126 French Avenue in Brockton, Massachusetts. (Ruidiaz Revised Transcript at 5). The dispatcher reported to police officers that there was a green Mercedes firing off weapons. (Ruidiaz Revised Transcript at 5). She alerted police officers that all parties involved were wearing red shirts and that there were two shots fired. (Ruidiaz Revised Transcript at 5).

The officers arrived no later than five (5) minutes after being dispatched. (Benvie Dep. at 9: 21-25). The street was completely quiet. See (Benvie Dep. at 10: 5-13). There was a green Mercedes with the passenger door open. (Benvie Dep. at 10: 5-13). Defendant was sleeping peacefully in the passenger seat. (Benvie Dep. at 40: 23-25). Police Officer Hyland approached the passenger side of the car. (Benvie Dep. at 33: 12-14). Police Officer Benive was behind the front passenger door, directly behind Officer Hyland. (Benvie Dep. at 33: 1-3). Police Officer Hyland nudged him on the shoulder until he woke up. (Benvie Dep. at (15: 12-20), (32: 14-17), and (33: 6-8)); (Police Report, July 17, 2005). There was no reaction, verbal or physical, by Mr. Ruidiaz. (Benvie Dep. at (15: 12-17), (16: 3-6), (33: 15-18), and (34: 4-6)).

Officer Hyland immediately took hold of his right forearm and began to pull him out of the car. (Benvie Dep. at 15: 17-20); (Police Report, July 17, 2005).  Officer Benvie took hold of his left arm so that he could not make any movements with it.  (Benvie Dep. at 16: 11-13); (Police Report, July 17, 2005).  Officer Paul searched him, revealing a gun in his waistband.  (Benvie Dep. at (16: 24-45)-(17: 1-2); (Police Report, July 17, 2005).

At that point the officers arrested Mr. Ruidiaz.  (Benvie Dep. at 17, 7-11).  After the arrest, Officer Benvie called the phone number from the anonymous 911 call.  (Benvie Dep. at 23, 1-4).   At that time, the caller who did not see shots fired and could not identify the shooter, changed his story one more time.  (Benvie Dep. at 23: 1-8).  He told police that they had arrested the correct person who was firing the shots.  (Benvie Dep. at 23: 1-8).

Officer Hyland searched the car, street and yards for ballistic evidence and found none. (Police Report, July 17, 2005).

I.  DEFENDANT, FLORENTINO RUIDIAZ, TOOK NO ACTION, NOR MADE ANY MOVEMENTS WHICH WOULD LEAD POLICE OFFICERS TO REASONABLY BELIEVE THAT CRIMINAL ACTIVITY WAS AFOOT.

Police Officers Hyland, Benvie and Paul seized a half-awoken Defendant Ruidiaz out of his car and frisked him without reasonable suspicion to do so.  Where a police officer observes unusual conduct leading him to reasonably be suspicious that criminal activity is afoot and that the person he is dealing with may be armed and dangerous, he is entitled to conduct a carefully limited search of the outer clothing of that person in an attempt to discover weapons which may be used to assault him.  Terry v. Ohio, 392 U.S. 1, 30 (1968).  However, in order to justify an intrusion, by search and seizure, upon a private citizen's constitutionally protected interests, a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.   Terry v. Ohio, 392 U.S.

1, 21 (1968); See United States v. Espinoza, 433 F.Supp.2d 186, 190 (D. Mass 2006); United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004); United States v. Hart 334 F.Supp.2d 5, 16 (D. Mass 2003); United States v. Galab, 325 F.3d 63, 66 (1st Cir 2003).  The officer must be able to articulate more than an "inchoate and unparticularized suspicion or "hunch" of criminal activity. United States v. Galab, 325 F.3d at 66; Terry v. Ohio, 391 U.S. at 27.  The facts leading to the unjustified invasion of Mr. Ruidiaz's personal security do not rise to the level of reasonable suspicion required under Terry.

In Terry v. Ohio, a police officer observed three men hovering on a street corner for an extended period of time.  Terry v. Ohio, 391 U.S. at 22.  Each took turns pacing an identical route to a store window where they paused and peered inside, then returned to the street corner. Id at 23.  Each time one man returned from the route, a conference immediately took place at the corner. Id.  After repeating such action about twenty-four (24) times, one man from the group swiftly left and was soon followed by the other two, a couple blocks away.  Id. The court held that the Officer's suspicion was reasonable to cause him to investigate, consequently pat-frisk the three men, and arrest them for unlawfully possessing weapons. Id at 22-23.  The court reasoned that each action alone would not rise to the level of reasonable suspicion, but all actions taken together warranted further investigation. Id at 22.

In Stanley, the defendant's motion to suppress was denied because the movements made while in his car, led police officers to reasonably suspect that he was concealing drugs and reaching for a weapon.  United States v. Stanley, 915 F.2d 54 (1st Cir. 1990).  Defendant was crouched down in the driver's seat. Id. at 55.  The officer saw a faint light coming from the center console, from which they inferred he was doing some form of drug.  Id.  As soon as defendant noticed police he leaned toward the console, toward the passenger seat, head down. Id.

The officer knew from experience that persons engaged in narcotics often carry firearms. Id. The Court held that said observations coupled with the fact that the car was parked in a high crime area for drug related activity led the police officer to reasonably believe defendant was reaching for a weapon. Id. Thus the motion to suppress was denied. Id.

Unlike Terry and Stanley, in the case at hand there was no conglomerate of actions or movements taken by Mr. Ruidiaz to cause the investigating officers to reasonably suspect that criminal activity was afoot and that he was armed and dangerous. He was peacefully asleep in the passenger seat of a car outside his home when he was poked by Officer Hyland until he awoke. He was not hiding from the police officers. He was not making any motions which would lead one to reasonably infer that he was hiding anything or reaching for a weapon. He was asleep.

The government may argue that while police officers were pulling Mr. Ruidiaz from the car, they observed him reaching for his waist area, thus causing them to restrain his left arm. This fact was never mentioned in the initial police report from the day of the arrest. (Police Report, July 17, 2005). Furthermore, Officer Benvie asserts that he restrained Mr. Ruidiaz's arm from movement as a routine precaution. See (Benvie Dep. at 16: 11-13). It was not until more than a month later, August 22, 2005, when the arresting officers met with Special Agent Sheila O'Hara and AUSA Jim Arnold and added this detail to the investigatory reports. (Report of Investigation by ATF, August 24, 2005, Bates #76). The fact that such an action was left out of the initial police report is suspicious. One may reasonably infer that these officers knew they were lacking sufficient facts to lead to a reasonable suspicion and to actually seize Mr. Ruidiaz from the car and search him. More significant is the fact that this alleged conduct occurred after the officers had already initiated the unlawful seizure of his body from the car. Thus, the police

officers cannot use said alleged conduct to aid in justifying a reasonable suspicion that criminal activity was afoot.

If this Court finds that Mr. Ruidiaz did verbally respond to Officer Hyland upon being awakened, it does not justify their unlawful search of Mr. Ruidiaz. Initial discourteous or nervous responses to police are a normal reaction by an individual to their presence. "Nervousness is a natural reaction to police presence". United States v. McKoy, 402 F.Supp.2d 311, 317, *aff'd* 428 F.3d 38 (1st Cir 2005)). Nervousness is a factor the police can consider, but nervousness alone is not sufficient. Id. "Nervousness is of limited significance in determining reasonable suspicion…and the government's reliance on…nervousness must be treated with caution." Id. One can reasonably infer that Mr. Ruidiaz was startled from being abruptly awakened from a sound sleep. It is expected that police officers nudging him and flashing a flashlight in his face would make him nervous, whether he spoke or not. If Mr. Ruidiaz reacted in any manner it would have been a normal reaction to police presence. Thus, it would not rise to the level of reasonable suspicion that he was armed and dangerous. It might raise an unparticularized suspicion, equivalent to a mere "hunch" that criminal activity may be afoot, but Police officers must articulate more than a hunch, an intuition, or desultory inkling of possible criminal activity. United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) (citing Terry v. Ohio, 391 U.S. at 27); United States v. Galab, 325 F.3d at 66 (citing Terry v. Ohio, 391 U.S. at 27).

If there were some kind of response by Mr. Ruidiaz upon being awakened, it cannot be described as "belligerent". Belligerent conduct, for example, is where a person goes into a state of rage and charges toward police officers entering an apartment door. United States v. Romain, 393 F.3d at 72. If Mr. Ruidiaz did verbally respond it was not loud enough to be heard by Officer Benvie who was standing directly behind Officer Hyland. (Benvie Dep. at (33:1-3), (15:

12-17), (16: 3-6), (33: 15-18), (34: 4-6)).  Officer Benvie made clear that he did not hear a response from Mr. Ruidiaz, nor see him make any suspicious movements when he was first awakened from sleep.  (Benvie Dep. at (15: 12-17), (16: 3-6), (33: 15-18), and (34: 4-6)). [1] There is no evidence that Mr. Ruidiaz moved toward or resisted physically.  At most, he made a less than polite response, but in no way was it belligerent.  Thus, an insubstantial argument that Mr. Ruidiaz was belligerent would not help the government justify the unlawful search.

II.   THE CALLER WHO ALLEGEDLY PLACED THE 911 EMERGENCY CALL IS ANONYMOUS AND UNRELIABLE

An officer may rely upon an informant's tip to establish reasonable suspicion only if the information carries "sufficient 'indicia of reliability'" to warrant acting on it.  United States v. Romain, 393 F.3d at 73 (Where 911 caller was found to be a reliable source of information to justify government's search and seizure because she identified herself and spoke to police face-to-face at the scene.  Motion to suppress denied.); Florida v. J.L., 529 U.S. 266, 270 (2000) (cited heavily in Romain to distinguish reliability of 911 caller in each case).  The caller in this case refused to identify himself to police.  He was also somewhat inaudible, slurring his speech, and continuously contradicting himself during his 911 call.  These factors considered alone or together reveal the obvious fact that the caller is suspicious and unreliable.  Thus, the government cannot rely on this unidentified person to justify its unlawful search and seizure of Defendant, Mr. Ruidiaz.

A.   THE ALLEGED 911 CALLER REMAINS ANONYMOUS AND THUS UNRELIABLE

---

[1] Officer Benvie clearly recalls this incident.  See (Benvie Dep.).  He describes Defendant's actions and statements in detail.  See (Benvie Dep.).  Officer Benvie made clear that he did not hear a response from Mr. Ruidiaz when he was first awakened from sleep.  (Benvie Dep. at (15: 12-17), (16: 3-6), (33: 15-18), and (34: 4-6)).

The 911 call that initiated this investigation was made by an unidentified and therefore unreliable source. An anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity. United States v. Romain, 393 F.3d at 73 (*citing* Florida v. J.L., 529 U.S. 266, 270 (2000). There is no information upon which the government can rely to assert that the anonymous caller was reliable.

In Florida v. J.L., the motion to suppress the weapon found on J.L.'s person was allowed because the tip came from an unknown caller whose reliability could not be tested. The caller identified the bus stop where defendant was standing. Florida v. J.L., 529 U.S. at 268. She described him as a black male wearing a plaid shirt. Id. When the police arrived they saw three black males standing together. Id. Only one wore a plaid shirt. Id. They made no threatening or unusual movements. Id. One of the officers approached J.L. and frisked him finding a gun in J.L.'s pocket. Id. The Court allowed the motion to suppress. It reasoned that the anonymous call concerning J.L. provided no predicative information and therefore left the police without means to test the informant's knowledge or credibility. Id. at 260. The Court explained that an accurate description of the subject's readily observable location and appearance may help to identify a person who the tipster means to accuse, but does not show that the tipster had knowledge of criminal activity. Id. at 261. It further reasoned that even though the allegation of the gun turned out to be correct, it does not suggest that the officers, prior to the frisk, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct. Id.

Similar to Florida v. J.L., the informant/caller is anonymous. He provided no predicative information, leaving the police with no means to test his credibility. He refused to speak to police face-to-face and he remains unidentified. (Benvie Dep. at 23: 1-22); (Report of Investigation by ATF, August 24, 2005, Bates #76). In fact, he hid from Officer Benvie when

8

Benvie entered the location from where he called. (Benvie Dep. at 23: 1-22). Police only know the phone number from which he made the 911 call. (Benvie Dep. at 23: 1-22); (Report of Investigation by ATF, August 24, 2005, Bates #76). They have not been able to determine his name or his residence. (Benvie Dep. at 23: 1-22); (Report of Investigation by ATF, August 24, 2005, Bates #76). The only information he gave was the original 911 emergency call. Like in Florida v. J.L., even though the allegation of the gun turned out to be correct, it does not suggest that the officers, prior to the frisk, had a reasonable basis for suspecting Mr. Ruidiaz of engaging in unlawful conduct. See Florida v. J.L., 529 U.S. at 261.

An informant/911 caller who hides from police and refuses to identify himself is not at all credible or reliable. In-person communications, as opposed to phone calls, are more reliable because, having revealed one's physical appearance and location, the informant knows that she can be tracked down and held accountable if her assertions prove inaccurate. United States v. Romain, 393 F.3d at 73 (citing Florida v. J.L., 529 U.S. at 270). A known informant can be held responsible if his allegations turn out to be fabricated. Id. at 73. The caller in this case could very well have fabricated these allegations or, after having heard the recording of his somewhat inaudible and contradictive call, he could have been describing his own hallucinations. This anonymous and inaccurate tipster does not demonstrate any basis of the caller's knowledge or veracity. See Id.; Florida v. J.L., 529 U.S. 266, 270 (2000). Thus one cannot rely on this information when determining whether police officers had a reasonable suspicion to seize Mr. Ruidiaz out of the car, bind his arms, and frisk him.

  B. THE ALLEGED 911 CALLER IS CONTRADICTORY WHICH FURTHER REINFORCES THAT HIS CREDIBILITY IS NON-EXISTENT

The anonymous caller in this case is not at all reliable because he contradicts himself numerous times during the 911 call.  Furthermore, the recording of the call also reveals this unidentified person's slurred and somewhat inaudible speech.  An officer may rely upon an informant's tip to establish reasonable suspicion only if the information carries "sufficient 'indicia of reliability'" to warrant acting on it.  United States v. Romain, 393 F.3d at 73;  Florida v. J.L., 529 U.S. 266, 270 (2000).  That determination entails examination of all circumstances bearing upon the tip itself and the tipster's veracity, reliability, and basis of knowledge.  United States v. Romain, 393 F.3d at 73.

As explained *supra at 9*, this Honorable Court should allow Mr. Ruidiaz's motion to suppress for the same reasons that the Florida v. J.L. Court allowed defendant's motion to suppress.  It may be even easier to decide in Mr. Ruidiaz's favor because unlike the anonymous caller in Florida v. J.L., the caller in this case is completely inaccurate and unreliable from the beginning of his conversation with the 911 dispatcher.  On the tape recording he is inaudible and is slurring his words.  The caller contradicted himself and changed his statements at least six times during the 911 call.  First he said he was outside the house.  (Ruidiaz Revised Transcript at 1).  In his next line says he was inside.  (Ruidiaz Revised Transcript at 1).  He first claimed a neighbor fired a gun.  (Ruidiaz Revised Transcript at 1).  Then he quickly corrected himself to say that he did not know from where the shots came from.  (Ruidiaz Revised Transcript at 1).  It was only after he alleged that shots were fired that he noticed a green Mercedes and decided that the shots were fired from that car.  (Ruidiaz Revised Transcript at 2-3).  He changed his mind for a third time and alleged "the gun [was] at the house".  (Ruidiaz Revised Transcript at 3).  He could not identify the shooter because they were all wearing red shirts.  (Ruidiaz Revised

Transcript at 3). However, when Officer Benvie called him back, he told police they had arrested the right person. (Benvie Dep. at 16, 11-13).

The anonymous caller's report does not come close to matching the description of the scene, except that there was a green Mercedes involved. The caller describes the scene as there being many people all wearing red shirts. (Ruidiaz Revised Transcript at 3) ("they're deep, like a lot of people, like, you know what I'm saying…"). In fact 126 French Street was quiet. There was nobody present but Mr. Ruidiaz sleeping in the green Mercedes. He was not wearing a red shirt. Even if his shirt were red, according to Florida v. J.L., an accurate description of the person's shirt does not show that the caller had knowledge that Mr. Ruidiaz was involved in criminal activity. See Florida v. J.L., 529 U.S. at 261.

The caller is totally unreliable and suspicious. This anonymous and inaccurate tipster does not at all demonstrate his basis of knowledge or veracity. See United States v. Romain, 393 F.3d at 73; Florida v. J.L., 529 U.S. 266, 270 (2000). The suspicious nature of the 911 call, the contradictory statements made by the caller, and the fact that there is absolutely no evidence proving that anything remotely similar to what the caller described actually occurred, indicate that these allegations were fabricated. After having heard the recording of his somewhat inaudible and contradictive caller, one can assume that he was relating his own hallucinations. Even though the allegation that there was gun on the scene turned out to be correct, it does not suggest that the officers, prior to the frisk, had a reasonable basis for suspecting Mr. Ruidiaz of being engaged in unlawful conduct. See Florida v. J.L., 529 U.S. at 260.

Furthermore, assuming arguendo that caller were reliable, it is unlikely that such a large amount of people wearing red shirts shooting off guns would somehow completely disperse within the short amount of time it took for the police to arrive. It is highly unlikely that the

excitement of guns going off would cause a man to fall asleep soundly in less than five minutes. If there actually were so many red-shirted people outside, and there were shots being fired, more than one person would call 911. Nobody else called to report this alleged event. No ballistic evidence was found at the scene. (Police Report, July 17, 2005, Bates #69). There is no evidence that anything the caller described actually occurred.

IV.    CONCLUSION

There are no concrete, specific and articulable facts that the police can assert in order to justify their search of Mr. Ruidiaz. The reasonableness of official suspicion must be measured by what the officers knew before conducting their search. Florida v. J.L., 529 U.S. at 260. Upon arrival, officers had no articulable facts upon which to rely. All information came from an unreliable caller who contradicted himself throughout the 911 call. The only fact that matched this anonymous caller's description was the presence of a green Mercedes. Said fact is insignificant when determining "reasonable suspicion". See Florida v. J.L., 529 U.S. at 261.

The fact that Mr. Ruidiaz was inside the car is not sufficient information to reasonably suspect that he was armed and dangerous. It leads only to a "hunch". In determining whether a search and seizure was justified, police officers can only rely on specific reasonable inferences which they are entitled to draw from the facts. Terry v. Ohio, 392 U.S. at 27. They are not entitled to rely on their inchoate and unparticularized suspicion or "hunch". Id. That the "hunch" turned out to be correct does not suggest that the officers had a reasonable basis to suspect that Mr. Ruidiaz was engaging in unlawful conduct. See Florida v. J.L., 529 U.S. at 26.[2]

---

[2] If the Court finds that Mr. Ruidiaz did verbally respond to Officer Hyland upon waking up, a nervous reaction to police presence may rise only to the level of an unparticularized hunch that criminal activity was afoot. A mere hunch does not warrant their intrusion of Mr. Ruidiaz's personal security. See Terry v. Ohio, 392 U.S. at 27. One typical reaction to police presence does not rise to the level of reasonable suspicion. United States v. McKoy, 428 F.3d 38 (1st Cir. 2005).

The rule excluding evidence seized in violation of the Fourth Amendment has been recognized as the only effective deterrent of police misconduct in the criminal context, and without it the constitutional guarantee against unreasonable searches and seizures would be a mere "form of words". <u>Terry v. Ohio</u>, 392 U.S. 1, 8. For the above reasons, defendant Florentino Ruidiaz respectfully requests that this Honorable Court exclude from evidence the weapon and ammunition found on his person incident to the unlawful search and seizure to which he was subject.

>   Respectfully Submitted,
>   Florentino Ruidiaz, Jr.,
>   By his attorney,
>
>   /s/ Robert S. Sinsheimer
>   B.B.O No. 464940
>   Denner Pellegrino, LLP
>   4 Longfellow Place, 35th Floor
>   Boston, MA 02114
>   617-722-9954

Dated: September 29, 2006

## Certificate of Service

I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 29, 2006.

>   /s/ Robert S. Sinsheimer