**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|                                    |       |                              |
|------------------------------------|-------|------------------------------|
| **UNITED STATES OF AMERICA**       | )     |                              |
|                                    | )     |                              |
| v.                                 | )     | **CRIMINAL NO. 05-10214-MLW**|
|                                    | )     |                              |
|                                    | )     |                              |
| **FLORENTINO RUIDIAZ, JR.,**       | )     |                              |
|                                    | )     |                              |
| Defendant                          | )     |                              |

**UNITED STATES' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America , by its attorneys Michael J. Sullivan, United States

Attorney for the District of Massachusetts, and Assistant United States Attorney James E.

Arnold, hereby submits this response in opposition to defendant's motion to suppress:

## I.  INTRODUCTION

Defendant Ruidiaz is charged with one-count of being a felon in possession of a firearm

and ammunition in violation of 18 U.S.C. § 922(g)(1).  He seeks to suppress a gun and

ammunition recovered by police who, while responding to an emergency 911 call of shots fired

from a green Mercedes parked outside 126 French Avenue, encountered the defendant in the

vehicle.  The crux of defendant's suppression argument is that the police did not have reasonable

suspicion of criminal activity to justify the pat-down frisk that resulted in the discovery of a

loaded gun in his waistband.  In making this argument, Ruidiaz completely discounts the

emergency 911 call made to the Brockton Police Department, which was the impetus for the

officers' encounter with the defendant.  Ruidiaz argues that the 911 call should be ignored

because the caller was anonymous and thus unreliable under Florida v. J.L., 529 U.S. 266

(2000).

Contrary to Ruidiaz's argument, J.L. is not dispositive of this case.  Unlike the caller in J.L. who provided no identifying information, the 911 caller in this case provided crucial identifying information -- he identified himself as a neighbor and provided the Brockton Police Department with a callback telephone number.  He was not therefore truly anonymous.  Moreover, unlike the caller in J.L., the 911 caller in this case displayed firsthand knowledge and reported an ongoing emergency situation (gunshots) requiring immediate police action.

Given these circumstances, the 911 caller's information was reliable, and the officers were entitled to consider that information in making their reasonable suspicion determination.  The officers' knowledge that a 911 caller had reported shots from a green Mercedes parked at 126 French Avenue combined with other facts available to the officers -- including (1) the lateness of the hour; (2) a location known by the officers to be high-crime area characterized by guns, violence, and drugs; (3) the officers' discovery of a green Mercedes parked as described by the 911 caller at 126 French Street; (4) the fact that the vehicle was illegally parked with the passenger door open into the line of traffic; (5) the fact that the defendant was visibly slumped in the passenger seat and did not move when the officers shone a flashlight on him; (6) the fact that the defendant responded belligerently and cursed upon an officer's inquiry as to whether he was okay; and (7) an officer's smell of alcohol on the defendant -- provided more than the necessary reasonable suspicion justifying the officers' protective frisk of the defendant.  Accordingly, the defendant's motion to suppress should be denied.

## II.  FACTUAL BACKGROUND

On July 17, 2005, shortly after midnight, the Brockton Police Department received an emergency 911 call from a male caller.  The 911 caller was advised that the call was being

recorded and then was asked to state his emergency.  Def. Exh. 1, at 1.[1]  The 911 caller reported

shots were being fired from a green Mercedes at 126 French Avenue.  Id., at 1-3.  The 911 caller

stated that he lived next door and that he heard two gunshots.  Id., at 3-4.  He reported that there

were several people and he was not sure who had the gun.  Id., at 3.  The caller provided his

telephone number to the dispatcher in the event that the officers needed to contact him, but

advised the dispatch officer that he was not going to be outside.  Id., at 4.

Dispatch personnel immediately notified officers on duty that they had received a report

of gunshots being fired from a green Mercedes at 126 French Avenue.[2]  Id., at 5.  Dispatch

personnel further advised the officers that "the green Mercedes is still there, it's out front.  Ah,

the caller thinks they live there.  All parties involved have red shirts on and there were, ah, two

shots, I believe, two shots fired."  Id.

Brockton Police Officers Brian Benvie and Thomas Hyland were two of the officers who

responded to the dispatch.[3]  Officers Benvie and Hyland were assigned to the impact shift -- a

shift that was designed specifically to handle Priority 1 calls concerning crimes in progress such

as "B&E's, gunshots, rape in progress type of things."  Benvie Deposition, at 7:11-12.  The

officers were familiar with the area around 126 French Avenue -- it was a high crime area known

---

[1]  This call was taped by the Brockton Police Department and is available for the court's
review.  A transcript of this call is attached as Defendant's Exhibit 1.

[2]  Communications between dispatch and the Brockton Police officers were also
recorded.  The transcript of their communications is also attached as Defendant's Exhibit 1.

[3]  Unless otherwise indicated, the remaining factual background is based upon the
narrative contained in the Brockton Police Department's Arrest Report, which was prepared
contemporaneously by one of the arresting officers, Thomas Hyland, on July 17, 2005, and
signed by him under the pains and penalties of perjury, and upon the sworn testimony of Officer
Brian Benvie, who gave a deposition pursuant to Fed. R. Crim. P. 15(a) on July 19, 2006.  These
are attached as Defendant's Exhibit 2 and Defendant's Exhibit 3, respectively.

for "drugs, prostitution, guns, gang, gang related violence" and was one of the areas targeted on the impact shift.  Id., at 9:7-10, 9:19, 37:20-22, 38:1-10.

The officers arrived at 126 French Avenue at approximately 12:30 a.m.  Id., at 10:4. Upon their arrival to 126 French Avenue, the officers saw a green Mercedes parked in front of 126 French Avenue.  Id., at 10:7-10.  The vehicle was facing the wrong way in the street and was parked partially blocking the sidewalk.  The passenger door to the vehicle was open, facing traffic.  Id., at 10:7-10, 38:11-24; Def. Exh. 2.

The officers approached the Mercedes' open passenger door and could see an individual (Ruidiaz) slumped in the front seat.  Def. Exh. 2.  The individual appeared to be dead.  Benvie Deposition, 13:19-25, 14:6-10.  His head was cradled awkwardly against the head rest, his eyes were closed, and his arms were wrapped against his torso.  Def. Exh. 2.  Given the report of gunfire and the fact that the individual was not moving in the vehicle, the officers initially believed that the individual might have been shot.  Id.

When the officers shone their flashlights in the vehicle, the individual remained motionless.  Benvie Deposition, at 14:20-25, 15:1-10.  Thereafter, Officer Thomas Hyland reached into the car, touched the individual's shoulder and inquired whether he was okay.  Def. Exh. 2; Benvie Deposition, at 15:12-15.  At that point, Ruidiaz replied belligerently, "You fucking okay?"  Def. Exh. 2.  Officer Hyland smelled alcohol in the vehicle.[4/]  Defendant's response surprised Officer Hyland.  Def. Exh. 2.  No longer concerned about Ruidiaz's well-

---

[4/] See Interview Report of Officer Thomas Hyland dated August 24, 2005, and attached as Government's Exhibit 1.

being, Officer Hyland was now concerned that Ruidiaz might be armed (given the radio dispatch about shots fired from this vehicle).  Id.

Wanting to frisk Ruidiaz for weapons, Officer Hyland took hold of Ruidiaz' right forearm and asked him to exit the car.  Id.  As he did so, Officer Hyland felt Ruidiaz's muscle tighten.  Id. After Ruidiaz responded, "What the fuck do you want me out of the car for," Officer Hyland pulled Ruidiaz out of the car and guided him onto the pavement.  Id.  Officer Benvie immediately secured Ruidiaz's left arm.  Id.  A third officer on the scene (Detective Nazaire Paul) pat-frisked Ruidiaz.  Id.  During the frisk, Detective Paul found a silver .357 caliber revolver tucked in the front waistband of Ruidiaz pants.  Id.  Detective Paul handed the revolver to another detective (Detective Sam Carde), who determined that the gun was fully loaded with 6 rounds of ammunition.  Id.

The officers placed the defendant under arrest and put him in the police cruiser.  Benvie Deposition, at 17:7-11.  While in the cruiser, the defendant became agitated, yelling that he would do his one-year mando.[5]  Id., at 18:15-21.

Afterwards, Officer Benvie called Brockton Dispatch for the telephone number of the original 911 caller.  Id., at 22:23-25, 23:1-2.  Officer Benvie wrote the telephone number down in his notebook and called it.  Id., at 23:2-4, 27:3-12.  A male answered the phone and did not identify himself to Officer Benvie.  Id., at 23:4-8.  The caller told Officer Benvie that he was watching the officers and that they had apprehended one of the shooters.  Id., at 23:5-7.

---

[5]  Officer Benvie explained that he understood the defendant to be referring to the fact that in the Commonwealth of Massachusetts unlicensed possession of a firearm requires a one-year mandatory prison sentence.  (Benvie Deposition, at 19:18-25).

A short while later, Officer Benvie again called the above telephone number to try and obtain additional information.  Id., at 23:10-11.  No one answered the phone, but Officer Benvie received a call a short time later from the same unidentified individual.  Id., at 23:11-12.  Officer Benvie again tried to get the caller to identify himself, but the caller refused.  Id., at 23:12-14. The caller stated he was in a basement apartment.  Id., at 23:14-16.[6/]

### III.  ARGUMENT

#### A.    Police Officers Are Entitled to Undertake Protective Frisks Based upon Reasonable Suspicions that an Individual Is Armed and Dangerous

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that police officers acting in furtherance of legitimate investigations must be permitted to take reasonable steps to protect themselves by searching a suspect for weapons or taking other protective measures.  Id. at 23-24. Underlying this holding was a recognition that "[t]he Fourth Amendment does not require police officers to take unnecessary risks in the performance of their duties."  United States v. Barboza, 412 F.3d 15, 16 (1st Cir. 2005).

An "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger."  Terry, 392 U.S. at 27.   The purpose of a protective search in the absence of probable cause is not to discover evidence of a crime, but to neutralize the threat of physical harm to police officers and others.  See United States v. Nee, 261 F.3d 79, 84-85 (1st Cir.2001); see generally Perry v. Borderley, 2005 WL 1665999, at *3 & n.11 (D. Mass. July 18, 2005) (Stearns, J.) (officers who have duty to respond immediately to reports of

_____

[6/]  Officer Benvie later went into the apartment, but no one was present.  Id., at 23:20-22.

gunfire must also be free to take reasonable steps to protect themselves when encountering person whom the officer considers dangerous).

In evaluating an officer's actions, the touchstone is whether the officer's beliefs and actions were reasonable under the totality of the circumstances. See United States v. Romain, 393 F.3d 63, 70-71 (1st Cir. 2004). Evaluating whether an officer's suspicions are reasonable requires a fact-intensive inquiry, according deference to the experienced perceptions of the officers. Id., at 72. "[A]n officer is permitted to conduct a 'reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'" United States v. Taylor, 162 F.3d 12, 20 (1st Cir. 1998) (quoting Terry, 392 U.S. at 27). Courts have emphasized that:

> When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon. . . .'"

Barboza, 412 F.3d at 17 (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983) (internal quotation omitted)).

The standard for reasonable suspicion is considerably less demanding than that required to establish probable cause. Terry simply requires that the temporary detention or encounter be based upon "at least a minimal level of objective justification." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). The test in evaluating a Terry-frisk relies on two separate considerations: first, whether the officers' actions were justified at their inception; and second, whether the officers'

actions were reasonably related in scope to the circumstances justifying the officers' initial interference.  Nee, 261 F.3d at 83.

### B.    The Officers Had Sufficient Evidence to Establish the Requisite Reasonable Suspicion Justifying Their Protective Frisk of the Defendant

Applying these principles to the facts of this case,[7] there can be little question that the officers' actions in this case were appropriate.  First, with respect to the officers' initial encounter with Ruidiaz, not only did the vehicle in which Ruidiaz was found match the description of the 911 call, but it was also at the very location indicated in that call.  Moreover, it was illegally parked on the sidewalk and was facing the wrong direction with the passenger door open in the field of oncoming traffic.[8]  Upon approach, the officers saw the defendant in the car.  The defendant was completely motionless and was sitting in an awkward position that suggested to the officers that he may have been shot or was dead.  These facts provided more than an ample basis for Officer Hyland to initiate an encounter with the defendant.

Officer's Hyland's subsequent actions upon encountering the defendant were also entirely reasonable.  After a valid Terry-stop, a police officer may legally pat-frisk an individual for

---

[7] In support of his suppression motion, defendant has submitted three things:  (1) the Brockton Police Department arrest report; (2) Officer Benvie's deposition testimony; and (3) a brief affidavit by the defendant.  In the defendant's affidavit, he notes that he was asleep in a vehicle parked on French Street and that he "was awakened by a police officer, who ordered me out of the vehicle so that he could search me."  Because defendant does not mention the officer's initial inquiry as to whether he was okay nor his response to that question, it is unclear as to the defendant's position with respect to those statements.

[8] This fact, in and of itself, was sufficient to justify an initial approach and detention. See, e.g., United States v. Choudhry, 461 F.3d 1097 (9th Circuit 2006) (reasonable suspicion of a parking violation sufficient to support an investigatory stop); United States v. Copeland, 321 F.3d 582, 593-95 (6th Cir. 2003).

weapons where "the officer is justified in believing that the person is armed and dangerous to the officer or others." Romain, 393 F.3d at 71 (internal quotation omitted)).

In evaluating an encounter to determine whether it satisfies this test, a court must consider the totality of the circumstances. See United States v. Sokolow, 490 U.S. 1, 8 (1989). Factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together. United States v. Arvizu, 534 U.S. 266, 274-75 (2002); Sokolow, 490 U.S. at 9- 10. Although in certain situations no one factor will be determinative, the combination of all the factors may nonetheless give rise to reasonable suspicion. Sokolow, 490 U.S. at 9-10; Gilliard, 847 F.2d 21, 24-25 (1st Cir. 1988).

The determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training. See Wardlow, 528 U.S. at 125. "Deference is due to the experienced perceptions of the officers." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000). While the officers must have more than a mere "hunch" to justify their actions, the "practical experience of officers who observe on a daily basis what transpires on the street" must be considered and credited. United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); see also Arvizu, 534 U.S. at 273-74. In taking action after making an investigatory stop or otherwise encountering an individual, an officer must be "responsive to the emerging tableau--the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006) (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).

Here, the facts known at the time, in concert with the facts learned upon encountering Ruidiaz, amply supported Officer Hyland's conclusion that Ruidiaz might have been armed and dangerous:

       1)     The officers had received a radio dispatch stating that a 911 caller had reported shots had been fired from a green Mercedes parked at 126 French Street; the citizen who made the call previously had advised dispatch that he was living next door to the property and voluntarily provided a telephone number for the officers to contact him for follow-up questioning.  See, e.g., United States v. Hoskie, 2000 WL 1052022 (D. Conn. July 26, 2000);

       2)     On approach to 126 French Street, the officers were aware that they were going into a neighborhood known to be a high-crime area in which there were regular reports of gunfire and drug dealing.  See Wardlow, 528 U.S. at 124 ("the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis"); Trullo, 809 F.2d 108, 111-12 (1st Cir. 1987).

       3)     The encounter in this high-crime area took place late at night, at a time when there is an even greater likelihood of criminal activity.  See, e.g., Adams v. Williams, 407 U.S. 143, 147-48 (1972) (officer "had ample reason to fear for his safety" when, during a proper investigation of criminal activity, officer engages an individual who was sitting alone in a car in a high-crime area at a late hour); United States v. Stanley, 915 F.2d 54, 56 (1990) (late night encounter with single occupant of parked car in high crime area gave rise to reasonable suspicion); see generally United States v. Valentine, 232 F.3d 350, 356 (3d Cir. 2000);

       4)     Upon arrival to 126 French Street, the officers discovered a vehicle matching the caller's description (a green Mercedes).  The vehicle was illegally parked – facing

the wrong direction with its passenger door open partially obstructing the line of traffic.  See, e.g., United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (factoring into reasonable suspicion calculus fact that vehicle was illegally parked); United States v. Myers, 102 F.3d 227, 232-33 (6th Cir. 1996) (upholding Terry stop and frisk on basis of fact that vehicle was illegally parked); see generally Pennsylvania v. Mims, 434 U.S. 106, 110-11 (1977) (officer, having stopped vehicle for traffic violation, may require driver to exit vehicle and frisk driver for weapons);

       5)     Upon approaching the vehicle, the officers could see an individual in the passenger seat who was positioned awkwardly and who did not move either when the officers approached the vehicle or when they shone a flashlight into the vehicle;

       6)     In response to the officer's inquiry as to his well-being, the defendant responded belligerently and cursed at the officer.  See, e.g., Romain, 393 F.3d at 72 (fact that police officers, while responding to anonymous call that individual in apartment had a gun, encountered the defendant acting belligerently gave rise to reasonable suspicion that defendant might be involved in criminal wrongdoing as well as a reasonable concern for the officer's safety); United States v. Henning, 906 F.2d 1392 (10th Cir. 1990) (officer justified in requiring individual to step out of vehicle where individual was belligerent and abusive).  Moreover, the officer could smell alcohol on the defendant. Cf. United States v. Sanders, 994 F.2d 200, 207 (5th Cir. 1993) (factoring alcohol consumption into Terry calculus: "If Sanders had been consuming alcoholic beverages, his judgment might have been impaired and his inhibitions reduced. In such a state Sanders might be more likely to resort to violence as a perceived solution to the apparent impending police investigation.")

Given the totality of all of these factors, reasonable suspicion existed to justify the officers' frisk of Ruidiaz.  Accord United States v. Benitez-Macedo, 129 Fed.Appx. 506 (11th Cir. 2005) (upholding Terry vehicle stop, removal of vehicle occupants, and frisk where (1) officers received a radio dispatch reporting receipt of a call that shots were fired at 2:00 a.m. with a vehicle description; (2)  the officers spotted the vehicle less than a mile away from the scene where the shots were fired and within minutes of the shots fired report; and (3) the vehicle remained stopped at an intersection, across the stop bar, while the traffic lights cycled twice from green to red); United States v. Brown, 334 F.3d 1161 (D.C. Cir. 2003) (upholding Terry stop and search where (1) officers received late-night report of gunshots in parking lot; (2) the incident took place in a neighborhood known for a lot of drug activity and in which, earlier the same year, there had been several homicides and numerous calls of gunshots; (3) there were only two occupied vehicles in the parking lot; and (4) the officers saw the occupants engage in what appeared to be furtive activity).[9]

**B.** **The 911 Call and the Information Provided During That Call Should Not Be Discounted in Evaluating Reasonable Suspicion**

Relying upon Florida v. J.L., 529 U.S. 266 (2000), defendant argues that the police officers were not entitled to rely upon the information provided by the 911 caller because defendant alleges that the caller was anonymous and hence unreliable.  Defendant is, however,

---

[9]  The totality of circumstances in this case are quite different from those found insufficient to justify a frisk for weapons in the cases defendant relies upon such as United States v. McKoy, 428 F.3d 38, 39-41 (1st Cir. 2005) (involving a day-time stop for parking and license plate violations in a high-crime area).

incorrect.[10/]  The 911 caller in this case was not truly anonymous; he provided sufficient information for the police to contact him and to identify him later, if necessary.  Given this fact, the caller's information was sufficiently reliable to be considered by the officers.  Furthermore, the 911 caller's information was sufficiently reliable for a second reason:  the 911 caller was reporting ongoing criminal activity (gunshots) that presented an immediate and imminent danger to the community.  Moreover, the 911 caller had firsthand knowledge of the events transpiring, and the caller provided the information under circumstances allowing for the officers to give the statements heightened reliability.  For all of these reasons, J.L. is inapposite.

### 1.    The 911 caller in this case, unlike the caller in J.L., was not truly anonymous

J.L. was a case involving a truly anonymous caller.  The caller did not identify him- or herself, the caller provided no information about him- or herself, and no recording was made of the call.  The only information communicated by the caller was that a young black male wearing a plaid shirt was standing at a bus stop and was carrying a gun.  529 U.S. at 268.

In response to the call, two officers went to the bus stop in question, where they found three black males, one of whom was wearing a plaid shirt.  "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct."  Id.  The officers did not see a firearm, and J.L. made no threatening or unusual movements.  Despite this, one of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from his pocket.

---

[10/]  Even were defendant correct, sufficient facts existed to warrant the officers' actions given the illegal manner in which the vehicle was parked, the time of night, the officers' knowledge that the car was in a high-crime area, and defendant's conduct and responses to Officer Hyland's inquiry as to his well-being.

Given these facts, the Supreme Court rejected the search. The Supreme Court emphasized the fact that tip in the case before it had insufficient indicia of reliability to be credited by the police:

> Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S., at 329, 110 S.Ct. 2412. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.*, at 327, 110 S.Ct. 2412.

J.L., 529 U.S. at 270. The Supreme Court noted that the anonymous tip at issue only identified a person, it did not provide any information concerning criminality. "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." Id. at 271.

Unlike the caller in J.L., the 911 caller in this case provided personally identifiable information: he voluntarily provided his telephone number and his location. Having done so, the 911 caller knew that he was making himself traceable and identifiable to the police. Indeed, after the discovery of the gun on the defendant, Officer Benvie called the number provided by the 911 caller and spoke with the caller, who confirmed that the defendant was, in fact, one of the individuals who had been shooting the guns that precipitated the 911 call. Thereafter, the 911 caller called Officer Benvie back and confirmed that he lived next door in a basement apartment.

Under these facts, the 911 caller in this case cannot be deemed equivalent to the anonymous, unreliable caller as was at issue in J.L. Had it turned out that the information

14

provided by the 911 caller in this case was false, it would have been a simple matter for the police to contact the telephone company and obtain the subscriber information for the number provided by the caller. <u>See</u> M.G.L.A. ch 166 § 14A (authorizing telephone companies to provide telephone number, street address, and subscriber information of telephone used to place 911 call, which can be used, *inter alia*, "in any ensuing investigation or prosecution, including the investigation of false or intentionally misleading reports of incidents requiring emergency service"). Thus, having provided the police with a telephone callback number, the 911 caller effectively allowed his identity to be determined, thereby subjecting himself to potential criminal charges had he provided false information during the call. <u>See</u> M.G.L.A. ch 269, § 13A; <u>see generally</u> 17 B Richard W. Bishop, Mass. Prac. Series § 53.72 (5th ed. 2005) (citing statute as relevant to false reports of crime made by telephone); <u>cf.</u> <u>Commonwealth v. McDevitt</u>, 57 Mass.App.Ct. 733, 737-38 & n.6, 786 N.E.2d 404 (2003) (individual who is traceable through license plate number is not anonymous and may face exposure for filing a false report if information provided to the police was not correct); <u>Commonwealth v. Love</u>, 56 Mass.App.Ct. 229, 233-34 & n.6, 775 N.E.2d 1264 (2002) (same).

"If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip." <u>J.L.</u>, 529 U.S. at 276 (Kennedy, J. concurring). Unlike the truly anonymous caller in <u>J.L.</u>, the 911 caller in this case did not cloak himself in anonymity in order to be able to lie with impunity. <u>See id.</u>, at 275-76. Instead, after being advised that the call was being recorded, the 911 caller provided critical pieces of information: he identified himself as a neighbor, advised that he was reporting events as they were unfolding, and he provided a callback number to the police dispatcher when asked. Thereafter, he again spoke with one of the

15

arresting officers and confirmed that which he had previously reported.  Under these

circumstances, the 911 caller should not be viewed as being the type of anonymous tipster about

which the Supreme Court in J.L. expressed concerns.  See, e.g., Romain, 393 F.3d at 73 (caller

who communicated contemporaneous information, suggested a likelihood of concern about her

personal safety, and who thereafter was willing to reconfirm the accusation was not akin to the

anonymous tipster in J.L.); United States v. Hoskie, 2000 WL 1052022, *8 (D. Conn. 2000);

State v. Gomez, 6 P.3d 765, 768 (Ariz. App. Div. 1 2000) (distinguishing J.L. because individual

placed 911 call from private home that was traceable placed her credibility at risk); see also

United States v. Hernandez, 2001 WL 1344832 (W.D.N.Y.) (J.L. not applicable where sufficient

information existed for Buffalo Police to have investigated and traced the call back to the caller

if necessary), recommendation adopted, 2001 WL 1705118 (W.D.N.Y. 2001), aff'd on

other grounds, 63 Fed.Appx. 6 (2nd Cir. 2003); Commonwealth v. Costa, 65 Mass.App.Ct. 640,

644-45, 843 N.E.2d 103 (caller not truly anonymous where caller's cell phone number was

traceable), review granted, 447 Mass. 1101, 848 N.E.2d 1211 (2006).

>    **2.    The 911 caller's firsthand report of an imminent and ongoing
>         emergency required immediate police action and was inherently
>         reliable**

Even if this Court were to view the 911 caller as having been truly anonymous, the nature

of the call provides two other critical distinguishing features between this case and J.L.:  first, the

911 caller here was reporting activities about which he had firsthand knowledge; and second, the

911 caller was reporting an ongoing emergency situation.

Among the various problems identified by the Supreme Court in J.L. was the fact that the

tipster, in addition to being anonymous, provided no basis for the information being provided.

529 U.S. at 271 ("All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L."). In contrast, in this case, as evidenced by the taped recording of the 911 call, the 911 caller was providing contemporaneous information based upon his firsthand knowledge. Hernandez, 2001 WL 1344832, at *12.

Not only did the 911 caller in this case provide information based upon his own firsthand knowledge, the information he provided concerned an emergency placing the community at risk -- individuals were shooting guns outside. It is well-understood that the Fourth Amendment does not require police officers to stand idly by when exigent or emergency circumstances exist -- particularly when issues of public safety are involved. See, e.g., United States v. Martins, 413 F.3d 139, 146-47 (1st Cir. 2005) (warrantless searches permitted under exigent circumstances including "a threat, posed by a suspect, to the lives or safety of the public, police officers, or to herself"); United States v. Wihbey, 75 F.3d 761, 766 (1st Cir. 1996) (identifying "danger to the safety of the public or the police" as exigent circumstances allowing for warrantless search); see generally United States v. Tibolt, 72 F.3d 965, 969-71 (1st Cir. 1995); United States v. Bartelho, 71 F.3d 436, 442 (1st Cir. 1995).

In J.L., the Supreme Court recognized that certain situations present instances of sufficient and imminent danger to individuals in the community that even a truly anonymous tip, by itself and without corroboration, may be sufficient to warrant a search. 529 U.S. at 273-74. Similarly, the First Circuit has noted that "there may be a rationale for according special weight to anonymous tips in cases of an imminent threat to public safety[.]" United States v. Monteiro, 447 F.3d 39, 49 (1st Cir. 2006) (citing J.L.).

17

Although the First Circuit has not expanded upon this exception, other courts have recognized that 911 calls reporting imminent danger to the community or other emergencies need to be addressed immediately by the police -- even if such calls are truly anonymous.  As a result, the courts have relaxed or eliminated the need for additional reliability beyond that set forth in the 911 telephone call reporting the emergency situation.  See, e.g., United States v. Holloway, 290 F.3d 1331, 1335-40 (11th Cir. 2002) (911 call reporting shots fired); United States v. Wimbish, 337 F.3d 947, 949-50 (7th Cir. 2003) (911 call reporting shots from burgundy Ford Explorer with shiny rims sufficient to justify stop and search); United States v. Breckenridge, 400 F.Supp.2d 434, 441-42 (D. Conn. 2005) (reports of shots fired); see also United States v. Harrell, 268 F.3d 141, 150-51 (2d Cir. 2001) (Meskill, J.).

In reaching this conclusion, the courts have emphasized the fact that 911 emergency calls, even if anonymously made, require immediate police attention:

911 calls are the predominant means of communicating emergency situations. Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior.  Additionally, the exigencies of emergency situations often limit the ability of a caller to convey extraneous details, such as identifying information.  Furthermore, some callers, particularly neighbors, may be understandably reticent to give identifying information for fear of retaliation or danger.  Thus, the fact that a 911 caller chooses--or is forced--to remain anonymous may very well have little bearing on the veracity of the caller.  If law enforcement could not rely on information conveyed by anonymous 911 callers, their ability to respond effectively to emergency situations would be significantly curtailed.

Once presented with an emergency situation, the police must act quickly, based on hurried and incomplete information.  Their actions, therefore, should be evaluated "by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences."

Holloway, 290 F.3d at 1339 (footnotes and internal citations omitted); accord Hoskie, 2000 WL 1052022, at *8 ("[A] rule requiring police to check every source before acting on it would be unworkable, particularly when weapons violations are reported . . . The time lost rechecking information given to a dispatcher would lead to fewer successful police interventions, thereby undermining the rationale articulated in Terry for permitting the lesser Fourth Amendment intrusion of a stop and frisk based solely on an officer's reasonable suspicion.").

Judicial recognition that officers must be accorded considerable latitude to rely upon and respond to 911 emergency calls in making snap judgments in the field is consistent with the nature of the calls and the circumstances under which such calls are made. Courts have long understood and accepted that 911 calls reporting ongoing emergencies are sufficiently inherently reliable to be admitted as substantive evidence at trial. See, e.g., Davis v. Washington, 126 S.Ct. 2266, 2276-77 (2006). As the First Circuit has noted in this context, such statements are deemed to be inherently reliable "on the theory that a person speaking about a startling event, while still under the stress of experiencing or observing that event, normally does not have either the capacity or the incentive to prevaricate." United States v. Brito, 427 F.3d 53, 61(1st Cir. 2005); see id., at 62-63 (911 caller's statements that she just heard gunshots and man was still in her line of sight evidenced imminent personal peril and were sufficiently reliable to be admitted at trial). Just as a 911 call reporting gunshots is sufficiently reliable to be introduced at trial as substantive evidence, so too must a 911 call be deemed sufficiently reliable for the responding police officers to consider when encountering an individual in an emergency situation.

19

In sum, the facts of this case are far different from those at issue in J.L. Here, the 911 caller reported an emergency situation: gunshots from a green Mercedes Benz located at 126 French Avenue. This information was reliable, and it was appropriate for the officers on the scene to consider this information in deciding to take justifiable protective action.

## IV.  CONCLUSION

For all the foregoing reasons, the defendant's motion to suppress should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ James E. Arnold
JAMES E. ARNOLD
Assistant U.S. Attorney
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3603

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

  /s/ James E. Arnold
JAMES E. ARNOLD
Assistant United States Attorney

Date:  November 3, 2006

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
## REPORT OF INVESTIGATION

| DDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge  Boston Field Division | Boston Field Division  FY-05  Report 005 |

| TITLE OF INVESTIGATION: |
|---|
| Florentino RUIDIAZ |

| CASE NUMBER:  52025-05-0089 | REPORT NUMBER:  5 |
|---|---|

TYPE OF REPORT: *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*  Sheila M. O'Hara | SUBMITTED BY *(Title and Office)*  Special Agent, Boston IV Field Office | SUBMITTED BY *(Date)*  08/24/2005 |
|---|---|---|
| REVIEWED BY *(Name)*  Kenneth J. Croke | REVIEWED BY *(Title and Office)*  Group Supervisor, Boston IV Field Office | REVIEWED BY *(Date)* |
| APPROVED BY *(Name)*  William J. Hoover | APPROVED BY *(Title and Office)*  Special Agent in Charge, Boston Field Division | APPROVED BY *(Date)* |

## DESCRIPTION OF ACTIVITY:

Interview with Officers Hyland and Benvie.

## SYNOPSIS:

On Monday August 22, 2005, AUSA Jim Arnold and Special Agent Sheila O'Hara met with three of the Brockton police officers involved with the arrest of suspect Florentino RUIDIAZ. Officers Hyland and Benvie had additional information that was not in the original Brockton PD reports. They were interviewed separately by AUSA Arnold and S/A O'Hara.

## NARRATIVE:

1. On Monday August 22, 2005, AUSA Arnold and S/A O'Hara first met with Officer Tom Hyland. The additional information he provided at this time was that he recalled smelling alcohol on suspect RUIDIAZ. Officer Hyland also advised that he asked RUIDIAZ if he had a license to carry a firearm and that RUIDIAZ did not answer him. This was the only additional information Officer Hyland provided at this time.

2. AUSA Arnold and S/A O'Hara then met with Officer Brian Benvie. Officer Benvie advised that as his partner, Officer Hyland, was pulling suspect RUIDIAZ out of the front passenger seat of the motor vehicle by RUIDIAZ's right arm, Officer Benvie observed RUIDIAZ make a motion with his left hand toward his waistband area. Officer Benvie said that is why he restrained RUIDIAZ's left hand. He also advised that he told Detective Paul to search the suspects waistband area, which Det. Paul did and recovered the firearm.

ATF EF 3120.2 (5-98)

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
## REPORT OF INVESTIGATION

| )DRESSED TO: <br> )ecial Agent in Charge <br> )ston Field Division | MONITORED INVESTIGATION INFORMATION: <br> Boston Field Division <br> FY-05 <br> Report 005 |
|---|---|
| TLE OF INVESTIGATION: <br> orentino RUIDIAZ | |
| \SE NUMBER: <br> )2025-05-0089 | REPORT NUMBER: <br> 5 |

3. Officer Benvie also advised that he called Brockton Dispatch for the telephone number of the original 911 caller. He wrote the telephone number down in his notebook, (508) 631-2394, and called it. He said that a male answered the phone and did not identify himself to Officer Benvie. He told Officer Benvie that he was in a basement apartment and could see Officer Benvie from where he was. The caller also told Officer Benvie that the individual they had arrested was one of two "shooters," but there was another "shooter" that got out of the car. Officer Benvie attempted to get the caller to come out and speak with him in person, but that the caller refused. Officer Benvie believes that telephone call lasted maybe 3-4 minutes.

4. Officer Benvie further advised that he called the above telephone number again to try and obtain additional information. No one answered the phone, but Officer Benvie received a call a short time later from the same unidentified individual. Officer Benvie again tried to get the caller to come out and speak with the police, but the caller again refused. Officer Benvie never located the unidentified caller. He did speak with two additional people in the driveway of 126 French Avenue. He wrote both of their first names down and their telephone numbers. They did not provide police any information regarding the incident. Officer Benvie provided a copy of the notebook page with this information on it. This was the only additional information provided by Officer Benvie at this time.

TF FF 3120.2 (5-98)

