```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
     v.                     )    C.R. No. 05-10214-MLW
                            )
FLORENTINO RUIDIAZ, JR.,    )
     Defendant              )
```

MEMORANDUM AND ORDER

Wolf, D.J.                                            June 28, 2007

I. INTRODUCTION

　　This Memorandum is based upon the transcript of the decision rendered orally on November 21, 2006, in which the court denied Defendant Florentino Ruidiaz's Motion To Suppress. This Memorandum adds citations, deletes some colloquy, and clarifies some language.

　　Ruidiaz is charged with being a felon in possession of a firearm and ammunition and seeks to suppress the evidence at the heart of the charge against him. In circumstances such as this, the Government bears the burden of proving by a preponderance of the evidence that the warrantless detention and search was reasonable under the Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny.

　　Essentially the motion presents two issues. First, whether it was reasonable for the Brockton police officer, Thomas Hyland, to seize the defendant. Second, whether it was reasonable for him to cause the defendant to be frisked. The Government has satisfied its burden on both issues.

II. FINDING OF FACTS

The facts proven by a preponderance of the evidence include the following. On the early morning of July 17, 2005, a 911 call to the Brockton Police Department was received at about 12:25 a.m. The caller did not disclose his name. However, he gave his address as 126 French Avenue, confirmed that he was calling from telephone number 508-631-2394, and told the police dispatcher that the dispatcher could call him back.

The caller reported, and the dispatcher broadcast, that guns were being fired from a green Mercedes Benz parked outside of 126 French Avenue and that all of the people involved were wearing red shirts. The dispatcher also broadcast that the information had come from a neighbor.

The dispatched information was received by Brockton police officers Hyland and Brian Benvie. Hyland and Benvie were on the High Impact Shift. It was their duty that night to respond to major matters like shootings. Hyland had been a Brockton police officer for seven years. As of July 17, 2005, he had made hundreds of arrests. In about three-quarters of those arrests the suspects had weapons such as guns or knives. Hyland knew from experience that French Avenue was a high crime area and that there were many shootings as well as drug dealings there. Additionally, he was familiar with the 911 system. He knew that it automatically disclosed and recorded the telephone number of the caller.

Hyland and Benvie drove to 126 French Avenue in about five minutes. They saw a green Mercedes Benz parked on the sidewalk on the wrong side of the street. The passenger door was open and protruded out into the street. As it was parked on the sidewalk, the vehicle violated Revised Ordinance of City of Brockton Chapter 12, Article 4, which the Brockton police officers were authorized to enforce.

Hyland approached the vehicle. Benvie was behind it. They each shined their lights into the car. Hyland saw the defendant slumped over in the front seat. The defendant did not move in response to the lights. Hyland thought that the defendant was either shot or dead. He put his hand on the defendant's shoulder and asked, "Are you okay?" The defendant angrily responded, "Are you fucking okay?"

At this point, Hyland feared that the defendant was a shooter rather than a victim. He was concerned that the defendant might be armed and dangerous. Therefore, in order to gain a tactical advantage and ensure the safety of the stop, he told the defendant to get out of the car.

In response, the defendant said, "Why do you want me out of the fucking car?" or "Why the fuck do you want me out?" This response elevated Hyland's concern that the defendant was armed and dangerous. Therefore, Hyland grabbed him and dragged him out of the car by his right arm. Benvie then took the defendant's left arm. They put the defendant on the ground. A second Brockton police car

arrived and Officer Nazaire Paul approached. Hyland asked Paul to frisk the defendant. Paul did so and found a gun in the defendant's waistband. The defendant was arrested, handcuffed, and given <u>Miranda</u> warnings.

Benvie then got, from the dispatcher, the telephone number of the caller. He called that number and spoke to somebody, but he did not get the name of that individual or meet him. The police officers then searched the area for witnesses and evidence of the reported shootings. They found none. The defendant is now charged with being a felon in possession of the firearm and ammunition that were seized by the Brockton police officers that evening.

III. DISCUSSION

The applicable legal standard for <u>Terry</u> stops is stated succinctly by the First Circuit in <u>United States v. McKoy</u>, 428 F.3d 38 (1st Cir. 2005):

> An officer may conduct a brief investigatory stop when he or she has a reasonable articulable suspicion that criminal activity is afoot. After a valid <u>Terry</u> stop, a pat frisk for weapons is also permissible where the officer is justified in believing that the person is armed and dangerous to the officer or others. It is insufficient that the stop itself is valid. There must be a separate analysis of whether the standard for pat frisks has been met. To assess the legality of a protective frisk, the Court looks at the totality of the circumstances to see whether the officer had a particularized objective basis for his or her suspicion.

428 F. 3rd at 39-40. In <u>McKoy</u>, the First Circuit went on to make several observations that are also pertinent to this case. It wrote:

> While police are permitted to take the character of a neighborhood into account in assessing whether a stop is appropriate, it is only one factor that must be looked at alongside all the other circumstances when assessing the reasonableness of the officer's fear for their safety.

Id. at 40. In McKoy, the First Circuit affirmed the granting of a motion to suppress in part because the case was not one where the "police had reason to suspect the presence of firearms based on the type of crime suspected." Id. (quoting United States v. Lott, 870 F.2d 778, 785 (1st Cir. 1989)).

In United States v. Chhien, 266 F.3d 1 (1st Cir. 2001), the First Circuit emphasized that further justification is needed for a pat frisk even if a Terry stop is justified:

> We start with the pat down search which amounts to a Terry stop within a Terry stop. Normally the police officer would have needed some justification, such as a reasonable fear for his own safety, beyond the traffic violation simplicitor to engage in it.

266 F. 3rd at 7.

In United States v. Stanley, 915 F.2d 54 (1st Cir. 1990), the First Circuit elaborated on the meaning of reasonable suspicion:

> We have noted that it must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation. Under Terry, the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation.

915 F.2d at 57. Reasonable suspicion may be based on the information provided by others and, therefore, it is not limited to a police officer's personal observation. Adams v. Williams, 407 U.S. 143, 147 (1972); United States v. Romain, 393 F.3d 63, 71 (1st

Cir. 2004). While an anonymous tip alleging possession of a firearm alone will usually not justify a <u>Terry</u> stop and frisk, <u>Florida v. J.L.</u>, 529 U.S. 266, 274 (2000), an anonymous tip with some indicia of reliability is one of the factors that can be considered in deciding whether the totality of the circumstances created reasonable suspicion. <u>United States v. Johnson</u>, 364 F.3d 1185, 1191 (10th Cir. 2004). Other relevant circumstances include whether the stop or frisk occurred in a high crime area, or late at night, and whether the suspect is belligerent. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) (high crime area); <u>Adams</u>, 407 U.S. at 147-148 (late at night); <u>Romain</u>, 393 F.3d at 72 (belligerent).

In analyzing reasonable suspicion, deference is due to the perceptions of experienced police officers. <u>United States v. Woodrum</u>, 202 F.3d 1, 7 (1st Cir. 2000). The reasons for that deference were well stated by the Eleventh Circuit in <u>United States v. Holloway</u>, 90 F.3d 1331, 1340 (11th Cir. 2002):

> Once presented with an emergency situation, the police must act quickly, based on hurried and incomplete information. Their actions, therefore, should be evaluated "by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." 3 Wayne LaFave, Search and Seizure § 6.6(a), at 391 (3d ed. 1996). As illustrated in an oft-quoted commentary from Chief Justice (then Judge) Burger, police officers must be given the authority and flexibility to act quickly, based on limited information, when human life is at stake[.]

90 F.3d at 1340.

Here, the green Mercedes Benz vehicle was parked illegally on

the sidewalk. This alone gave Hyland probable cause to order the defendant out of the vehicle. McKoy, 428 F. 3rd at 40 (applying Maryland v. Wilson, 519 U.S. 408, 415 (1997), and holding that "[w]hen a car is illegally parked, the police officer may order a passenger out."). Hyland's actual, subjective motive for ordering the defendant out is not relevant because there was, objectively, a proper basis to do so. See Whren v. United States, 517 U.S. 806, 819 (1996).

In addition, Officer Hyland had the required reasonable suspicion and fear to order the defendant to get out of the vehicle, to drag him out of the vehicle when he did not comply, and to frisk him for weapons. At the time he acted, Hyland knew that a neighbor, who claimed to be a witness, called 911 and said that shots were being fired out of a green Mercedes at 126 French Avenue. Reliance on that tip was reasonable because Hyland knew that the 911 system would identify the telephone number of the caller and put that caller at risk if the information provided was false. Moreover, Hyland knew that French Avenue was a high crime area and that there had been many arrests there for unlawful possession of guns and drugs. Also, it was late at night and most of the arrests that Hyland had made in his seven years as a Brockton police officer involved people who were armed.

As he approached the vehicle, Hyland saw a person slumped over. He asked that person if he was okay. The response was, "Are

7

you fucking okay?" This could have been an innocent reaction by somebody suddenly woken up. However, it is also sufficient, in the totality of the circumstances in this case, to have created a well-founded concern that the person in the vehicle was a shooter rather than a victim. By swearing at Hyland when the he was ordered to leave the vehicle, the defendant raised further Hyland's reasonable concern that the defendant was dangerous. Hyland was, therefore, justified in dragging the defendant from the car and ordering that he be pat frisked.

In contrast to McKoy, 428 F.3d at 39-40, the information from the tipster in this case gave Hyland reason to fear for his safety based on the type of crime reported. The green Mercedes at the scene was consistent with the tip of shots being fired, and would naturally and reasonably heighten Hyland's suspicion and concern for safety. Further, the report of shots fired raised a greater danger than existed in J.L., which involved only a report of a concealed weapon. See 529 U.S. at 274.

IV. ORDER

Accordingly, it is hereby ORDERED that Defendant Florentino Ruidiaz's Motion To Suppress is DENIED.

                                        /s/ Mark L. Wolf
                                      UNITED STATES DISTRICT JUDGE