# United States Court of Appeals
## For the First Circuit

No. 07-1988

UNITED STATES OF AMERICA,

Appellee,

v.

FLORENTINO RUIDÍAZ, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Robert S. Sinsheimer, with whom Lauren M. Thomas and Denner Pellegrino, LLP were on brief, for appellant.

James E. Arnold, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

June 12, 2008

**SELYA**, **Senior Circuit Judge**.  Charged with being a felon in possession of a firearm and ammunition, defendant-appellant Florentino Ruidíaz, Jr., attempted to suppress the most damning evidence against him.  The district court denied the motion.  The defendant thereafter entered a conditional guilty plea, reserving the right to challenge that order.

Following the imposition of sentence the defendant, acting on the reservation, instituted this appeal.  We conclude that the police acted reasonably under the circumstances and, accordingly, uphold the lower court's refusal to suppress the evidence in question.

## I.  BACKGROUND

In reviewing the disposition of a motion to suppress, "[w]e recount the relevant facts as the trial court found them, consistent with record support."  United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003).  The venue of the events at issue here is Brockton, Massachusetts.

Not long after midnight on July 17, 2005, a 911 caller reported a shooting.  The caller told the dispatcher that he was a neighbor, situated at or near 126 French Avenue.  He said that he had heard gunfire on the street and that those involved were wearing red shirts.  Pertinently, the caller stated that the shooter or shooters were in a green Mercedes Benz parked on the street at the French Avenue address.

-2-

The dispatcher received the caller's assurance that the police could return the call and confirmed the telephone number from whence the call had originated. At no time did the caller furnish his name. Moreover, he warned that he would not be on the street when the officers arrived.

News of the reported shooting was transmitted immediately to the Brockton police department. Officers Thomas Hyland and Brian Benvie, who as personnel seconded to the "impact shift" were designated to handle calls about dangerous situations, responded. Both officers were veterans of the force: each had worked as a Brockton policeman for at least seven years; each had made many arrests and dealt extensively with armed suspects; and each was aware that the locus of the incident was within a notorious high-crime area.

The 911 dispatcher told the officers what he had learned from the caller. Officer Hyland, having been trained in the workings of the 911 system, knew that callers' telephone numbers were automatically disclosed and recorded by the system.

Within five minutes of receiving the report, the two officers reached 126 French Avenue. Upon their arrival, they observed a green Mercedes parked on the wrong side of the street (i.e., facing the wrong way), partially on the sidewalk. The vehicle's front passenger door was fully ajar and jutted out into the street. As positioned, the Mercedes was in obvious violation

-3-

of at least two dictates embodied in a municipal ordinance.  See
Brockton Rev. Ords. ch. 12, art. 4, § 12-71.

        The officers approached the car and shined their
flashlights into it.  They observed the defendant slumped over in
the front passenger seat.  The district court did not make a
finding about the color of the defendant's shirt.

        The defendant did not respond to the flashlight beams.
Concerned that he might be either injured or dead, Officer Hyland
reached into the vehicle, touched the defendant's shoulder, and
asked if he was okay.  The defendant replied profanely, "Are you f-
----- okay?"  Startled by this outburst, Officer Hyland began to
worry that the defendant might be a shooter, not a victim.  Fearing
that the defendant might be armed, the officer asked him to step
out of the car.  The defendant replied either "Why do you want me
out of the f------ car?" or "Why the f--- do you want me out?"  The
officer then grabbed the defendant's right arm and pulled him from
the vehicle.

        At this point, Officer Benvie came to his partner's
assistance.  He grabbed the defendant's left arm and helped to
force the defendant to the ground.  By that time, another police
cruiser had arrived.  A third patrolman, Officer Nazaire Paul,
conducted a pat-frisk that disclosed a loaded handgun tucked into
the defendant's waistband.  An arrest followed.

-4-

A search of the surrounding area revealed nothing of consequence. Officer Benvie tried the 911 caller's telephone number and spoke to someone, but the person would not identify himself.

We fast-forward to August 24, 2005, when a federal grand jury indicted the defendant on a single count of being a felon in possession of a firearm and ammunition. See 18 U.S.C. § 922(g)(1). After the usual formalities (not relevant here), the defendant moved to suppress the gun and ammunition. He argued that the police had acquired that evidence in violation of the Fourth Amendment. The government opposed the motion.

The district court conducted an evidentiary hearing. It ultimately denied the motion from the bench. The court found that the government had proved by a preponderance of the evidence that the officers' actions were reasonable under the circumstances. The court later memorialized its findings and conclusions in a well-reasoned rescript. See United States v. Ruidíaz, Crim. No. 05-10214, slip op. (D. Mass. June 28, 2007) (unpublished).

On January 17, 2007, the defendant entered a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the denial of his suppression motion. The district court sentenced him to serve a 180-month incarcerative term. This timely appeal followed.

## II.  DISCUSSION

This appeal tests the limits of a so-called Terry stop. See Terry v. Ohio, 392 U.S. 1, 19-20 (1968).  The defendant contends that the police lacked sufficient legal justification to order him from the Mercedes, effect his removal, and frisk him.  In order to place his contention in context, we first erect the legal framework applicable to Terry stops and then apply that framework to the facts as supportably found by the district court.  Our standard of review for orders granting or denying suppression is familiar: we scrutinize the district court's factual findings for clear error and evaluate its conclusions of law (including its constitutional determinations) de novo.  Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).

### A.  The Legal Framework.

Because even a temporary police detention constitutes a seizure under the Fourth Amendment, that detention must be reasonable in order to pass constitutional muster.  Terry, 392 U.S. at 19; Chhien, 266 F.3d at 5-6.  The oversight of brief investigatory stops has two aspects.  First, a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop.  Terry, 392 U.S. at 21; Chhien, 266 F.3d at 6.  Second, actions undertaken pursuant to that stop must be reasonably related

-6-

in scope to the stop itself "unless the police have a basis for expanding their investigation." United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006).

Reasonableness in this context is a construct that must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives. See Terry, 392 U.S. at 21-22; see also Whren v. United States, 517 U.S. 806, 813 (1996). Not surprisingly, then, an inquiry into reasonableness requires a reviewing court to consider the totality of the surrounding circumstances. United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). This inquiry is fact-sensitive, and the requisite objective analysis must be performed in real-world terms. In other words, reasonableness requires a practical, commonsense determination, see United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998) — a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers, see Ornelas, 517 U.S. at 699; Chhien, 266 F.3d at 8.

Because reasonable suspicion is a protean concept, suspicion sufficient to justify an investigatory stop may be rooted in any of a variety of permissible scenarios. One such scenario exists when presumptively reliable information about criminal activity is provided by third parties. See, e.g., Romain, 393 F.3d at 71. That scenario includes reasonable inferences that may be

-7-

drawn when that information is viewed in light of the attendant circumstances. See id.

While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989); Romain, 393 F.3d at 71. It follows, therefore, that no direct link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion. Chhien, 266 F.3d at 6.

A Terry stop is not necessarily a snapshot of events frozen in time and place. Often, such a stop can entail an ongoing process. For that reason, "[t]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold." Romain, 393 F.3d at 71. This means that if an officer undertakes an investigation pursuant to a Terry stop, his ensuing actions must be "fairly responsive to the emerging tableau." Chhien, 266 F.3d at 6. As the investigation proceeds, however, the officer "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Id.; see Sowers, 136 F.3d at 27 (suggesting that "the actions undertaken by the officer following the stop [must be] reasonably responsive to the circumstances justifying the stop in the first place, as

-8-

augmented by information gleaned by the officer during the stop").

## B. **The Merits**.

With this framework in place, we return to the particulars of the case at hand. The defendant does not challenge the constitutionality of the officers' approach. He argues instead that their subsequent actions exceeded the permissible scope of a Terry stop when Officer Hyland ordered him out of the car, effected his removal, and had a pat-frisk performed.

The defendant's thesis proceeds along the following lines. The ordering of a passenger out of a parked car, under the guise of investigating a parking violation, was unconstitutional when the passenger had done nothing to make the officer fear for his safety. Yanking the passenger from the vehicle and frisking him were further steps down this unconstitutional path. Because the gun and ammunition were discovered through these unconstitutional means, that evidence should have been suppressed.

Based on these arguments, we are tasked with determining only the constitutionality of the officers' actions following their initial approach to the illegally parked Mercedes and their preliminary inquiry to the defendant. The totality of the circumstances is, therefore, of obvious importance.

When the officers arrived at the scene, it was after midnight. They found themselves in a notorious high-crime neighborhood. They were responding to a 911 call made roughly five

minutes earlier, reporting a shooting in progress. They were told that the gunfire had come from a green Mercedes located outside 126 French Avenue. Upon their arrival, they saw such a vehicle parked at that location in violation of a municipal ordinance. They also saw a man slumped over in the Mercedes — a man who proved unresponsive to flashlight beams. And, finally, the man acted belligerently when an officer inquired as to his welfare.

Although any one of those facts, taken alone, might not have been sufficient to create reasonable suspicion, see, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000), a fact that is innocuous in itself may in combination with other innocuous facts take on added significance. So it is here: the individual facts, taken in the aggregate, seem sufficient to trigger a reasonable suspicion that some criminal activity was afoot — and that the defendant was involved. See, e.g., Adams v. Williams, 407 U.S. 143, 147-48 (1972) (informant's report, high-crime area, and time of night combined to yield reasonable suspicion); United States v. Soares, 521 F.3d 117, 120-21 (1st Cir. 2008) (time of night, high-crime area, suspect's unusual behavior and use of profanity combined to yield reasonable suspicion); Romain, 393 F.3d at 72 (911 call, together with suspect's visible agitation and belligerence combined to yield reasonable suspicion); United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990) (time of night, high-

-10-

crime location, and unusual conduct combined to yield reasonable suspicion).

The defendant asserts that an important integer in this equation — the 911 call — should not have been accorded any weight. In his view, that call exhibited insufficient indicia of reliability to warrant any reliance on it. In particular, he points to the anonymity of the caller and attempts to analogize the call to the anonymous tip discussed in Florida v. J.L., 529 U.S. 266 (2000).

The analogy to J.L. is flawed. There, an unknown tipster called the police from an unknown location and gave them information. See id. at 270. The Court's opinion teaches that truly anonymous tips must be corroborated in some meaningful way in order to justify crossing the reasonable suspicion threshold. See id.

The defendant's argument overlooks that not every report from a nameless source is truly anonymous. As we have said, a label like "anonymous" has a chameleon-like quality; it can embrace a variety of things that differ from one another in important ways. See Romain, 393 F.3d at 74. Even though the caller in this case, like the caller in J.L., did not give his name, that similarity masks a salient difference between the two calls.

The difference is subtle but significant. Here, the 911 caller confirmed his telephone number and agreed that the police

could call him back. Because he was aware that his identity could easily be unearthed, the likelihood of prevarication was diminished. In addition, the police were well aware of the trace capabilities of the 911 system, so they knew that a caller could be tracked down if he provided false information. These accoutrements furnish substantial reliability insurance and serve to distinguish this case from J.L.[1]

That the caller did not want to be front and center does not cancel that insurance. The caller's self-identification as a neighbor permitted a reasonable inference that his reluctance to be seen or named derived from a fear of retaliation at the hands of the shooters. The Eleventh Circuit reasoned persuasively to that effect in United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002), in which it concluded that "the fact that a 911 caller chooses . . . to remain anonymous may very well have little bearing on [his] veracity." Id. at 1339.

The test, of course, does not hinge on the definition of "anonymous" but, rather, on whether the 911 call possessed sufficient indicia of reliability. See United States v. Brown, 500

---

[1]We add, moreover, that J.L. addressed anonymous tips in the context of the first — not the second — step of the Terry analysis. The J.L. Court noted that its decision applied only to "cases in which the officer's authority to make the initial stop is at issue" and "in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped." J.L., 529 U.S. at 274. The case at hand falls within the encincture of the latter scenario.

-12-

F.3d 48, 54 (1st Cir. 2007). That determination must be made in light of all the circumstances. Id. In our judgment, the facts alluded to above, taken in combination, comprised more than adequate indicia of reliability to allow the arriving officers to give some credence to the 911 report.[2]

The stage now set, we hark back to the scene. To recapitulate, when the police arrived, they noted the presence of the green Mercedes, illegally parked. That the car was impermissibly parked gave the officers all the more reason to approach it. See Chhien, 266 F.3d at 6.

Once they reached the vehicle, a new piece of information came to their attention: a man slumped over in the front passenger seat, unresponsive to lights shined in his face. Officer Hyland testified that, given the man's posture and the earlier report of gunfire associated with a green Mercedes, he believed that the man was injured or dead. Under the circumstances, that stated belief was objectively reasonable.

Spurred by a desire to check on the well-being of the comatose passenger, the officer touched the man's shoulder and

---

[2]This is especially so because the call referenced an ongoing emergency — gunfire in the streets. We have recognized before that reports about ongoing emergencies, by virtue of their very nature, necessitate quick action. See, e.g., United States v. Monteiro, 447 F.3d 39, 49 (1st Cir. 2006) (noting special weight due to anonymous tips when "imminent threat to public safety" is in prospect); Romain, 393 F.3d at 71 (attaching weight to emergency nature of 911 call).

inquired as to his status. That action, too, was objectively reasonable.

This brings us to the defendant's rejoinder. According to the officer, the defendant responded with a belligerent expletive. The defendant challenges the credibility of this testimony and, in support, points out that Officer Benvie did not hear the alleged response.

The defendant's challenge fails. Within wide limits, credibility judgments are for the district court, not for the court of appeals. See, e.g., United States v. Laine, 270 F.3d 71, 76 (1st Cir. 2001); United States v. Valle, 72 F.3d 210, 213-14 (1st Cir. 1995). Here, the district court credited Officer Hyland's version of the encounter. The officer's testimony is not sullied by any palpable inaccuracies, internal contradictions, or evident implausibilities such as would justify us in overriding the district court's credibility call.[3] Finding no clear error, we must defer to the lower court's decision to credit Officer Hyland's testimony about the defendant's response.

The defendant has a fallback position. He suggests that even if he did make a profane response, there may have been an innocent explanation for it. That suggestion misconceives the

---

[3]That officer Benvie did not hear the defendant's utterance is of little moment. At the time, he was positioned near the rear of the vehicle.

-14-

applicable legal principle.  The relevant question is not whether the officers could have interpreted the response in some more benign way but, rather, what degree of suspicion they reasonably could attach to the utterance in light of the surrounding circumstances.  See Wardlow, 528 U.S. at 128; Stanley, 915 F.2d at 57.  Using commonsense judgment, an objectively reasonable officer plausibly could have concluded — as Officer Hyland did — that the belligerence of the response indicated more than mere annoyance. So viewed, the response supported a reasonable suspicion of criminal activity.  See, e.g., Soares, 521 F.3d at 121; Romain, 393 F.3d at 72.  Put another way, the hostile response, along with the background information possessed by the officer and his own experience, was enough to ground a reasonable suspicion that the man he originally had thought was a victim might be a shooter.[4] See Chhien, 266 F.3d at 6 (recognizing that investigatory officers may shift the focus in order to remain responsive to emerging facts); Sowers, 136 F.3d at 27 (similar).

Once that suspicion arose, the officer's request that the defendant step out of the car was objectively reasonable. When a Terry stop is effected in connection with a traffic violation and

---

[4]The defendant makes much of the fact that the 911 call identified the shooters as wearing red shirts, yet the record is barren of any evidence that the defendant was so attired.  The totality of the circumstances is likely to encompass some facts favorable to the officer's conclusion and some unfavorable to it. There is no rule — nor should there be — that every datum in the totality must favor a finding of reasonable suspicion.

-15-

an officer's concern for his own safety is implicated, it is within the officer's authority to order a passenger out of the car as a security measure. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997). Moreover, an officer may issue such an order as a matter of course; he does not need to have an independent fear for his safety. See, e.g., United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006).

The defendant suggests that the reasoning behind the Wilson rule is that an officer's safety is jeopardized only when the number of occupants in a car outnumbers the police officers who are present. That suggestion is jejune. The Wilson Court recognized that the danger may arise "from the fact that evidence of a more serious crime might be uncovered during the stop." 519 U.S. at 414. This danger exists regardless of the number of persons in a stopped vehicle and may be traced to a passenger as easily as to the driver. See id. (explaining that "the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver"). Thus, we hold that Officer Hyland did not exceed the scope of his constitutional authority when he asked the defendant to step out of the Mercedes.

The defendant's final challenge is to the decision to pull him from the car and pat-frisk him. This challenge need not detain us.

As we have said, Officer Hyland's fear for his safety was based on an objectively reasonable belief that the defendant might be the shooter (and, therefore, might be carrying a gun). Upon being asked to exit the vehicle, the defendant balked; instead of exiting, he uttered more profanity, further heightening Officer Hyland's legitimate concerns.

Even without that further incitement, the pat-frisk would have been permissible. Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop. See Terry, 392 U.S. at 30; United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005). Thus, when the defendant refused to accede to Officer Hyland's request, the officers were constitutionally entitled to remove him from the vehicle and pat-frisk him. See Soares, 521 F.3d at 121 (holding removal from car and pat-frisk constitutional when defendant among other things refused to remain still and used profanity).

The defendant discourages this holding and invites us to invalidate the pat-frisk based on our decision in United States v. McKoy, 428 F.3d 38 (1st Cir. 2005). We decline the invitation.

In McKoy, we held that officers infringed a defendant's Fourth Amendment rights when the totality of the circumstances did not support a reasonable suspicion that the defendant posed a threat to their safety. Id. at 40-41. There, the police relied

-17-

solely on the area's dangerousness and the defendant's apparent nervousness to ground reasonable suspicion. See id. at 40. Here, in contrast, the officers were privy to numerous other facts supporting reasonable suspicion.  Thus, the totality of the circumstances here is incommensurate with that in McKoy.  It follows inexorably that the latter decision cannot carry the weight that the defendant loads upon it.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm the district court's denial of the defendant's motion to suppress.


**Affirmed**.